# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| KNIEAKAY T. HARRIS, | ) | |
| as independent administrator of the estate of | ) | |
| GERALD ANDRE GREEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 15-cv-10936 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| WEXFORD HEALTH SOURCES, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Gerald Andre Green was a prisoner in the custody of the Illinois Department of

Corrections ("IDOC") at Stateville Correctional Center ("Stateville"), who suffered from end-

stage renal disease. Several days before his scheduled release from prison, Green had a medical

emergency due to his illness. He was transferred to an outside hospital, where he died. The

administrator of Green's estate, Knieakay Harris, has now sued Wexford Health Sources, Inc.

("Wexford"), the state contractor that provides health care services to IDOC inmates, as well as

Dr. Saleh Obaisi and Nurse Bernadette Ononiwu, two Wexford employees who cared for Green at

Stateville. Harris has also brought claims against Defendants Michael Magana, who was

Stateville's warden at the beginning of 2014, Randy Pfister, Stateville's warden starting

November 2015, and NaphCare, Inc., a dialysis provider at Stateville, alleging that they lost or

destroyed Green's medical records. Now before this Court are the various Defendants' motions to

dismiss the claims against them in the Third Amended Complaint ("TAC"). (Dkt. Nos. 86, 89, &

100.) For the reasons stated below, NaphCare's motion is granted; Defendants Ononiwu, Obaisi,

and Wexford's[1] motion is granted in part and denied in part; and Defendants Magna and Pfister's[2] motion is granted.

## BACKGROUND

For purposes of the instant motions, the Court accepts the facts alleged in the TAC as true and draws all inferences in the plaintiff's favor. *See Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 826 (7th Cir. 2014).

Green had been a prisoner at Stateville since June 1, 2013; he was scheduled to be released on March 21, 2017. (TAC ¶ 5 at 2, ¶ 14 at 4, Dkt. No. 83.)[3] Green suffered from renal failure and hypertension—as a result, he required frequent dialysis and heath monitoring. (*Id.* ¶¶ 16, 17 at 5.) At the relevant time, Wexford and NaphCare had contracts with the State of Illinois to provide healthcare services and management within Stateville—with NaphCare providing dialysis. (*Id.* ¶¶ 8, 11 at 3.)

The medical emergency at the center of the present case was not Green's first hospitalization while he was incarcerated at Stateville. On February 25, 2014, he had to be transferred from Stateville to an outside hospital because he was experiencing a volume overload (*i.e.*, too much fluid in the body), pulmonary edema (*i.e.*, excess fluid in the lungs), and high blood pressure. (*Id.* ¶ 18 at 5.) Green was dialyzed over several days in the intensive care unit of the hospital to get his hypertension under control and then he was released from the hospital to return to Stateville with orders to continue dialysis. (*Id.*)

---

[1] For the purpose of this opinion, the Court refers to Defendants Ononiwu, Obaisi, and Wexford as, collectively, "Wexford Defendants."

[2] For the purpose of this opinion, the Court refers to Defendants Magna and Pfister as, collectively, "IDOC Defendants."

[3] Certain paragraph numbers are repeated in multiple sections of the TAC. To avoid confusion, references to the TAC include both paragraph numbers and page numbers.

However, on March 17, 2014, Green did not receive his regularly scheduled dialysis treatment. (*Id.* ¶ 19 at 5.) The next day, he had a medical emergency. It is unclear exactly what happened—some prison official or representative appears to have reported that Green lost consciousness during dialysis, while other medical records suggest that Green could not be dialyzed on March 18 or March 19 due to cardio-pulmonary distress. (*Id.* ¶ 20 at 5, 6.) Regardless, it appears that on March 18, 2014, Green presented to Stateville's medical department sometime around 10:00 to 11:30 p.m. in an acute distress. (*Id.* ¶ 35 at 21.) He was seen there by Nurse Ononiwu at around 2.00 a.m. By that point, Green was experiencing difficulty breathing and chest pain, and he was sweating and vomiting. (*Id.* ¶ 21 at 6.) His vital signs showed that Green had high blood pressure and low oxygen saturation. (*Id.*) Nurse Ononiwu called Dr. Obaisi, but Dr. Obaisi did not answer his phone. (*Id.* ¶ 22 at 6.) Dr. Obaisi was Stateville's medical director at the time, and, on March 19, 2014, he had a "duty" to be available to Statesville's medical staff for consultations 24 hours a day.[4] (*Id.* ¶ 29 at 26, ¶ 33 at 27.) Despite this duty, he did not return Nurse Ononiwu's call. (*Id.* ¶ 33 at 27.) Nurse Ononiwu then called another doctor who told her to send Green to a hospital. (*Id.* ¶ 22 at 6.)

Around 2:07 a.m., before the ambulance arrived, Nurse Ononiwu started Green on a saline infusion—a treatment that would only exacerbate Green's condition. (*Id.* ¶ 23 at 6, ¶ 37 at 21.) The infusion lasted at least until 2:50 a.m., when an ambulance took Green to an outside hospital. (*Id.* ¶ 25 at 6.) The hospital's records indicate that Green was unconscious and in cardiac arrest when the ambulance picked him up from Stateville. Green never regained consciousness; he passed away on March 24, 2017. (*Id.* ¶ 14 at 4, ¶ 26 at 6, 7.) The medical records show that immediately prior to his death, Green was diagnosed with acute fluid overload, end-stage renal

---

[4] The TAC is not clear on the exact nature of the alleged duty, such as whether Obaisi was "on call" that night or whether he had a general duty to answer the phone because he was Stateville's medical director.

disease on hemodialysis, hypertensive emergency, and chronic anemia. His cause of death was brain anoxic damage, cardiac arrest, and pulmonary edema. (*Id.* ¶ 15 at 5.)

As the administrator of Green's estate, Harris filed the present lawsuit on December 5, 2015. Her original complaint contained claims pursuant to 42 U.S.C. § 1983 for deliberate indifference to Green's serious medical need against Wexford, the IDOC's director, and Pfister as Stateville's warden. (Dkt. No. 1.) On February 17, 2016, Harris amended her complaint to include, among other things, § 1983 claims against NaphCare and Magana, as a "director" of IDOC. (Dkt. No. 26.) Harris amended her complaint again on March 24, 2016 to include § 1983 claims against Nurse Ononiwu and Dr. Obaisi, as well as claims under the Illinois Wrongful Death Act, 740 ILCS 180/1 *et seq.*, against Wexford, NaphCare, Nurse Ononiwu, and Dr. Obaisi. (Dkt. No. 34.) At some point, Harris discovered that some of Green's dialysis records were missing[5] and so she amended her complaint yet again on October 12, 2016. The resulting Third Amended Complaint, which is now the operative complaint before this Court, asserts § 1983 claims against Wexford (Count I), Nurse Ononiwu (Count VI), and Dr. Obaisi (Count VIII); Illinois Wrongful Death Act claims against Wexford (Count II), Nurse Ononiwu (Count VII), and Dr. Obaisi (Count IX); and negligent spoliation of evidence claims against Magana (Count III), Pfister (Count IV), and NaphCare (Count V). (Dkt. No. 83.)

## DISCUSSION

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

---

[5] It might have happened around July 27, 2016, during the parties' planning meeting. (*See* Mem. in Opp'n to Def.'s 12(b)(6) Mot. to Dismiss at 5, Dkt. No. 91.)

misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). In analyzing a motion to dismiss, the Court "must construe [the complaint] in the light most favorable to the plaintiff, accept well-pleaded facts as true, and draw all inferences in the plaintiff's favor." *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 826 (7th Cir. 2014) (internal citations omitted).

### I.  Wexford Defendants' Motion

### A.  Count I—Deliberate Indifference Claim against Wexford under § 1983

Wexford Defendants argue that Count I against Wexford should be dismissed because Harris has failed to sufficiently plead a deliberate indifference claim under a *Monell* theory of liability, as she did not adequately allege an unconstitutional policy or widespread practice required for such claim. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978) (requiring a plaintiff suing a local government under § 1983 to show that the constitutional violation was caused by an official policy, custom, or practice). Wexford Defendants also argue that Harris cannot impute liability to Wexford based on the actions of its employees as § 1983 does not create vicarious liability. Harris counters that Count I does not allege vicarious liability, but instead alleges that Wexford had an unspoken and unwritten practice of denying medically-necessary consultations and referrals for care outside of the prison, that Wexford had final policymaking authority, and that Green suffered harm because Wexford improperly and insufficiently trained its staff.

It is true that there is no *respondeat superior* liability under § 1983. *Collins v. Al-Shami*, 851 F.3d 727, 734 (7th Cir. 2017); *but see Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 786, 789–95 (7th Cir. 2014) *cert. denied,* 135 S. Ct. 1024 (2015) (questioning prior cases holding, "without persuasive explanations," that *Monell* applies to private corporations performing government

5

functions and precludes vicarious liability). Thus, to recover on a § 1983 claim, Harris must show

that Green's constitutional injury was caused by Wexford's express policy, a widespread, though

unwritten, custom or practice, or a decision by Wexford's agent with final policymaking

authority. *See Milestone v. City of Monroe, Wis.*, 665 F.3d 774, 780 (7th Cir. 2011). It is difficult,

but not impossible, to demonstrate an official policy or a custom based only on one inmate's

experience because ultimately evidence of a policy, not a random event, is needed. *Grieveson v.*

*Anderson*, 538 F.3d 763, 774 (7th Cir. 2008). At the same time, the Seventh Circuit has cautioned

district courts against applying a heightened pleading standard to *Monell* claims. *See White v. City*

*of Chicago*, 829 F.3d 837, 844 (7th Cir. 2016). And it is important to recognize that Harris's

pleading burden is commensurate with the amount of information available to her; she is not

expected to plead facts that are not accessible to her without discovery. *Runnion ex rel. Runnion v.*

*Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 528–29 (7th Cir. 2015). Hence, at

the motion to dismiss stage, Harris "need only ***allege*** a pattern or practice, not put forth the full

panoply of evidence from which a reasonable factfinder could conclude such a pattern exists."

*Barwicks v. Dart*, No. 14-cv-8791, 2016 WL 3418570, at *4 (N.D. Ill. June 22, 2016) (emphasis

in the original).

Here, the TAC has two problems. First, it does not sufficiently allege the existence of a

Wexford policy or widespread practice or custom. While Harris asserts that Wexford had an

unspoken and unwritten practice of denying referrals to outside hospitals that stemmed from the

desire to save money, she does not plead any facts to support that claim. Moreover, the TAC

actually describes that Green ***was*** taken to an outside hospital less than a month prior to the fatal

incident, and that when Nurse Ononiwu called a doctor on the night of the emergency, the doctor

***did*** tell her to send Green to a hospital. (TAC ¶ 18 at 5, ¶ 22 at 6, Dkt. No. 83.) Thus, the facts that

are alleged in the TAC do not support the reasonable inference that Wexford had a widespread policy of denying outside referrals. Similarly, Harris alleges that Wexford improperly trained its staff on how to care for patients with end-stage renal disease, but the TAC only describes Nurse Ononiwu's alleged lack of training—it does not contain allegations that would support an inference of a wide-spread problem with improper training.

Second, the TAC does not allege how Wexford's alleged policies or its decision as a final policymaker caused Green's injury. For example, the TAC does not reveal how Wexford's alleged desire to save money caused Green's injury, especially given that Green was actually taken to the hospital before and on the night of the emergency and there is nothing in the TAC to suggest that Nurse Ononiwu delayed Green's transfer to a hospital due to Wexford's policies or decisions. Therefore, Count I must be dismissed.

### B. Count VI—Deliberate Indifference Claim against Nurse Ononiwu

Wexford Defendants also argue that the deliberate indifference claim against Nurse Ononiwu should be dismissed because the allegations in the TAC make clear that she did not ignore Green, but instead was responsive to him. Harris counters that this argument ignores various allegations in the TAC that describe Ononiwu's failure to transfer Green to an outside hospital immediately, her decision to administer saline that would only worsen Green's condition, and her failure to review properly Green's medical records.

To state a claim for deliberate indifference, a plaintiff must allege an objectively serious medical condition and an official's deliberate indifference to that condition. *Cesal v. Moats*, 851 F.3d 714, 721 (7th Cir. 2017). The parties do not dispute that Green had a serious medical condition. Rather, they disagree about the second element of the claim, which requires that the official actually knew of, but disregarded, a substantial risk to the inmate's health. *Id.* The bar that

7

a plaintiff must clear to establish a deliberate indifference claim against a medical professional is high, as such a claim is not equivalent to a medical malpractice claim—medical professionals are entitled to deference in their treatment decisions unless no minimally competent professional would have so responded under the circumstances. *Roe v. Elyea*, 631 F.3d 843, 857–58 (7th Cir. 2011). Thus, a medical professional acting in a professional capacity may be held to have demonstrated deliberate indifference only if the professional's decision was such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the decision was not based on such a judgment. *Id.*

However, to state a valid deliberate indifference claim, a plaintiff does not need to show that he was literally ignored when demanding medical treatment. *Id.* at 857–58; *see also Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015). For example, even if a medical professional did not completely ignore the plaintiff's condition, a professional's "choice of the 'easier and less efficacious treatment' for an objectively serious medical condition can still amount to deliberate indifference." *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010). Moreover, a delay in treatment may also show deliberate indifference if such delay exacerbated the inmate's injury or unnecessarily prolonged his pain. *Id.*; *Perez*, 792 F.3d at 777. "[W]hether the length of delay is tolerable depends upon the seriousness of the condition and the ease of providing treatment"—in some cases, even a brief unexplained delay may constitute deliberate indifference. *Perez*, 792 F.3d at 778.

Here, Wexford Defendants' arguments ignore Harris's allegations that Green had a known, serious renal condition and that on March 18, 2014 he had an emergency situation—he was vomiting, had shortness of breath, chest pain, and high blood pressure. (TAC ¶ 21 at 6; Dkt. No. 83.) Yet this emergency was addressed only two and a half hours later—by infusing Green

for 40 minutes with a saline solution, a treatment that could only have worsened his condition. Only after that misguided treatment was Green taken to a hospital. (*Id.* ¶¶ 23–25 at 6, ¶¶ 35, 37 at 21.) Although Nurse Ononiwu's alleged conduct must amount to more than a simple malpractice for Count VI to survive, the TAC plausibly alleges that Ononiwu's decisions—from the administration of a harmful, ineffective treatment to the delay in transferring Green to a hospital—departed so substantially from accepted professional standards as to demonstrate that her decisions were not based on such standards. *See, e.g.*, *Mathison v. Moats*, 812 F.3d 594, 598–99 (7th Cir. 2016) (reversing a grant of summary judgment in favor of a defendant nurse who postponed immediate treatment of a heart attack for hours and noting that "civilization requires more in a life and death situation"). Therefore, Count VI survives the motion to dismiss.

### C. Count VIII—Deliberate Indifference Claim against Dr. Obaisi

Wexford Defendants next argue that the deliberate indifference claim against Dr. Obaisi must fail because he was not personally involved in the events at issue, as he was not at Stateville on the night of the emergency and did not speak with Nurse Ononiwu when she called him. Harris counters that Wexford Defendants interpret Dr. Obaisi's alleged involvement in Green's hardships too narrowly—as Harris claims that Dr. Obaisi was in charge of supervising inmate treatment in Stateville, setting up policies, and training medical staff, and that Dr. Obaisi did not pick up the phone to help with Green's emergency when he had a duty to be available for medical consultations.

It appears that Harris is conflating the requirements for supervisory liability under § 1983 with a *Monell* claim. *See also McDonald v. Obaisi*, No. 16-cv-5417, 2017 WL 4046351, at *3 (N.D. Ill. Sept. 13, 2017) (describing similar confusion between the two types of claims). For a personal liability claim, a plaintiff must establish that a defendant was personally responsible for

the deprivation of a constitutional right. This requirement can be satisfied if the conduct causing the constitutional deprivation occurs at the defendant's direction or with the defendant's knowledge and consent. *See Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995); *see also Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017). While for a *Monell* claim, the inquiry centers not on personal involvement but on the relationship between an official custom or policy and the constitutional deprivation. *See, e.g.*, *Gill*, 850 F.3d at 344.

Although Harris seeks to bring a personal liability claim against Dr. Obaisi, the TAC alleges that Dr. Obaisi was personally involved only by failing to pick up the phone on the night of the emergency. (TAC ¶ 33 at 27, Dkt. No. 83.) It is unclear how Harris believes this failure and the alleged constitutional violation are linked—especially given that Nurse Ononiwu was able to contact another doctor, who advised her to send Green to a hospital. (*Id.* ¶ 22 at 6.) The TAC also alleges that Dr. Obaisi knew that Green had end-stage renal disease and needed dialysis, and that Dr. Obaisi was in charge of ensuring that inmates received reasonable medical care, including transfers to an outside hospital. (*Id.* ¶¶31, 34 at 27, ¶ 36 at 28.) But there are no allegations to support a reasonable inference that Dr. Obaisi knew about any violations of Green's rights or that Dr. Obaisi directed or turned a blind eye to such violations. Therefore, Harris has not sufficiently pleaded Dr. Obaisi's personal involvement and Count VIII must be dismissed.

### D. Counts II and IX—Illinois Wrongful Death Act Claims against Wexford and Dr. Obaisi

Wexford Defendants also argue that the claim under the Illinois Wrongful Death Act against Dr. Obaisi should be dismissed because Harris improperly attempts to assert a claim for failure to supervise as a healing art malpractice claim. Wexford Defendants further argue that any claim for malpractice against Wexford should be dismissed to the extent it attempts to impute to Wexford liability for medical malpractice based on Dr. Obaisi's actions. Harris does not directly

address the issue of whether failure to supervise can serve as the basis for a malpractice claim, but rather she argues that she has pleaded the required elements of a claim under the Illinois Wrongful Death Act.

The Illinois Wrongful Death Act, 740 ILCS 180/1 *et seq.*, provides an independent cause of action for damages arising from a decedent's death caused by a wrongful act, neglect, or default. 740 Ill. Comp. Stat. Ann. 180/1 (Westlaw 2017). This cause of action is generally brought by a personal representative of the decedent for the benefit of the decedent's surviving spouse or next of kin. 740 Ill. Comp. Stat. Ann. 180/2(a) (Westlaw 2017). To maintain this cause of action, a plaintiff must allege that the defendant owed a duty to the decedent, that the defendant breached that duty, that the breach of duty proximately caused the decedent's death, and that pecuniary damages occurred to persons designated under the Act. *Rodgers v. Cook Cty.*, 998 N.E.2d 164, 172 (Ill. App. Ct. 2013). In a medical malpractice case, the burden is on the plaintiff to prove the proper standard of care for a defendant physician, a negligent failure to comply with the applicable standard, and a resulting injury proximately caused by the physician's lack of skill or care. *Jinkins v. Evangelical Hosps. Corp.*, 783 N.E.2d 123, 126–27 (Ill. App. Ct. 2002). Moreover, the Illinois Healing Arts Malpractice Act, 735 ILCS 5/2-622, requires that, "[i]n any action, whether in tort, contract or otherwise, in which the plaintiff seeks damages for injuries or death by reason of medical, hospital, or other healing art malpractice," the plaintiff must attach to the complaint an affidavit stating that the plaintiff has consulted with a health professional in whose opinion there is a reasonable and meritorious cause for the filing of the action; the plaintiff must also attach the written report of the health professional indicating the basis for the determination. 735 Ill. Comp. Stat. Ann. 5/2-622 (West 2017).

Wexford Defendants' argument is based on *Cohen v. Smith*, 648 N.E.2d 329, 332 (Ill.

App. Ct. 1995), which defines malpractice as:

> Professional misconduct or unreasonable lack of skill. . . . Failure of one rendering
> professional services to exercise that degree of skill and learning commonly
> applied under all the circumstances in the community by the average prudent
> reputable member of the profession with the result of injury, loss or damage to the
> recipient of those services or to those entitled to rely upon them.

Wexford Defendants contend that this definition does not encompass failure to train or supervise

medical staff.[6] But they cite no caselaw for the proposition that such a failure is insufficient to

serve as the basis for malpractice. To the contrary, at least for a hospital, Illinois courts have

recognized failure to supervise and train as a basis for institutional medical negligence. *See, e.g.*,

*Longnecker v. Loyola Univ. Med. Ctr.*, 891 N.E.2d 954, 971 (Ill. App. Ct. 2008). And in

considering the applicability of Section 622 requirements, Illinois courts interpret "healing art

malpractice" broadly. *See, e.g.*, *Jackson v. Chicago Classic Janitorial & Cleaning Serv., Inc.*, 823

N.E.2d 1055, 1059 (Ill. App. Ct. 2005). Likewise, Wexford Defendants do not explain why, even

if failure to train cannot be a basis for a healing art malpractice claim, Harris's claims should be

dismissed rather than considered as an ordinary negligence claim and allowed to proceed. *See*

*Lipsey v. United States*, No. 12-2100, 2013 WL 757652, at \*4 (C.D. Ill. Jan. 2, 2013) (stating that

although titled "medical malpractice," plaintiff's allegations could constitute ordinary negligence,

and that in-line with Federal Rule of Civil Procedure 8(e), the court refuses to elevate the form

over the substance of plaintiff's complaint by dismissing the claims on the theory that defendants

cannot be liable for medical malpractice because they are not medical professionals).

---

[6] Wexford Defendants' argument is somewhat unclear as, on one hand, they assert that failure to train and supervise "does not fall under the purview of an action for **healing art malpractice**." (*See* Dkt. No. 99 at 8 (emphasis added).) But on the other hand, they suggest that the expert report Harris filed, which is required under 735 ILCS 5/2-622 only for actions "in which the plaintiff seeks damages for injuries or death by reason of medical, hospital, or other **healing art malpractice**," might be insufficient. *See* 735 Ill. Comp. Stat. Ann. 5/2-622 (West 2017) (emphasis added).

The Court concludes that Harris has done enough at the pleading stage to proceed with her claims against Wexford and Dr. Obaisi under the Illinois Wrongful Death Act. The parties will have the benefit of discovery to flesh out the nature of the relationships and duties (or lack thereof) between the parties and the appropriate standard of care. At the appropriate time, Wexford Defendants may desire to challenge these claims by means of a summary judgment motion. In the meantime, Counts II and IX survive.

## II.     NaphCare's Motion and IDOC Defendants' Motion

### A.  Counts III, IV, and V—Statute of Limitations Issue

NaphCare and IDOC Defendants argue that the spoliation of evidence claims against them are time-barred because the claims were brought more than two years after Green's death. Specifically, these Defendants argue that the spoliation of evidence claims here are derivative causes of action, and thus inherit the two-year statutes of limitations of the underlying claims under § 1983 and the Illinois Wrongful Death Act. According to NaphCare and IDOC Defendants, these two-year statutes of limitations began to run at the time of Green's death. Because Harris brought her spoliation claims for the first time in the TAC on October 12, 2016— more than two years after Green died—she was too late. For her part, Harris does not dispute that a two-year statute of limitations applies[7] or that it began to run at Green's death, but instead she argues that the spoliation claims are not time-bared because they relate back to the complaints she filed prior to the two-year deadline.

---

[7] Although the parties here do not dispute that a two-year statute of limitations applies, there is some support in Illinois law for the conclusion that a five-year statute of limitations applies to Harris's spoliation claims. *See, e.g.*, *Skridla v. Gen. Motors Co.*, 46 N.E.3d 945, 947–50 (Ill. App. Ct. 2015) (discussing conflicting opinions of Illinois Appellate Courts regarding statute of limitations for a spoliation claim, but ultimately holding that because spoliation is a derivative cause of action, a limitations period of an underlying action applies).

A two-year statute of limitations governs claims under § 1983 arising in Illinois. *Kelly v. City of Chicago*, 4 F.3d 509, 511 (7th Cir. 1993). The Illinois Wrongful Death Act claims also are subject to a two-year limitations period. *See* 740 Ill. Comp. Stat. Ann. 180/2(d) (Westlaw 2017). However, contrary to the assertion that the statute of limitations began to run at Green's death, under Illinois law, the limitations period for a spoliation claim begins to run on the day of the destruction of the evidence or when the plaintiff discovers it, provided that the underlying claim itself was not time-barred on that day. *See, e.g.*, *Schusse v. Pace Suburban Bus Div. of Reg'l Transp. Auth.*, 779 N.E.2d 259, 267 (Ill. App. Ct. 2002); *see also Wofford v. Tracy*, 48 N.E.3d 1109, 1119 n.8 (Ill. App. Ct. 2015); *Skridla v. Gen. Motors Co.*, 46 N.E.3d 945, 948–50 (Ill. App. Ct. 2015) .

Green passed away on March 24, 2014. Harris filed her § 1983 and Illinois Wrongful Death Act claims against NaphCare and IDOC Defendants prior to the two-year statute of limitations deadline. (*See* Second Am. Compl., Dkt. No. 34 (filed on March 24, 2016).) At some point, Harris discovered that Green's medical records were missing. She then filed spoliation of evidence claims in her TAC on October 12, 2016. Under these facts, without additional information regarding when and how the records were lost and when Harris discovered the records were lost, there is no basis for the Court to find at the pleading stage that the statute of limitations had run before Harris filed her spoliation claims.

### B. Count V—NaphCare's Duty to Preserve Evidence

As the spoliation claims are not barred by the statute of limitations—at least not at the motion to dismiss stage—the Court must consider NaphCare's argument that the claims against it should be dismissed because Harris has failed to allege sufficiently that NaphCare had a duty to preserve Green's medical records.

Under Illinois law, spoliation of evidence is a form of negligence, so a plaintiff must prove that: (1) the defendant owed the plaintiff a duty to preserve the evidence; (2) the defendant breached that duty by losing or destroying the evidence; (3) this loss or destruction was the proximate cause of the plaintiff's inability to prove an underlying claim; and (4) as a result, the plaintiff suffered actual damages. *Martin v. Keeley & Sons, Inc.*, 979 N.E.2d 22, 27 (Ill. 2012). Regarding the duty element, the general rule in Illinois is that there is no duty to preserve evidence. *Id.* at 28. To establish an exception to this general no-duty rule, the plaintiff must show that "an agreement, contract, statute, special circumstance, or voluntary undertaking has given rise to a duty to preserve evidence on the part of the defendant," and that the duty extends to the specific evidence at issue because "a reasonable person in the defendant's position should have foreseen that the evidence was material to a potential civil action." *Id.*

NaphCare points out that the TAC bases its claim that NaphCare had a duty to preserve records on 735 ILCS 5/8-2001. But that statute ensures patients' rights to request medical records for examination; it does not create a duty to preserve such records. Specifically, 735 ILCS 5/8-2001(b) provides that:

> Every private and public health care facility shall, upon the request of any patient who has been treated in such health care facility, or any person, entity, or organization presenting a valid authorization for the release of records signed by the patient or the patient's legally authorized representative, or as authorized by Section 8-2001.5, permit the patient, his or her health care practitioner, authorized attorney, or any person, entity, or organization presenting a valid authorization for the release of records signed by the patient or the patient's legally authorized representative *to examine the health care facility patient care records*, including but not limited to the history, bedside notes, charts, pictures and plates, kept in connection with the treatment of such patient, and *permit copies of such records to be made* by him or her or his or her health care practitioner or authorized attorney.

735 Ill. Comp. Stat. Ann. 5/8-2001(b) (Westlaw 2017) (emphasis added). The statute defines "health care facility" as "a public or private hospital, ambulatory surgical treatment center, nursing home, independent practice association, or physician hospital organization, or any other

entity where health care services are provided to any person." 735 Ill. Comp. Stat. Ann. 5/8-2001(a) (Westlaw 2017). A review of the statute reveals that it governs access to medical records, rather than preservation of records. *See, e.g.*, 735 Ill. Comp. Stat. Ann. 5/8-2001(b) ("health care facility shall . . . permit . . . to examine the health care facility patient care records   . . . and permit copies of such records to be made"). Moreover, Harris does not cite and the Court is not aware of any caselaw suggesting that the statute imposes a duty on a medical provider, such as NaphCare, to preserve medical records so that a spoliation claim can be brought.

Harris claims that her complaint contains more than a mere allegation that NaphCare has a duty under the referenced statute. In support, she points to paragraphs 27–31 of the TAC. But she does not explain how the factual allegations contained in those paragraphs amount to a duty. And moreover, Harris does not allege that NaphCare had a duty to preserve Green's records due to some other circumstance, such as an agreement, contract, special circumstance, or voluntary undertaking. Indeed, the TAC suggests that NaphCare was not even a custodian of the medical records but simply had access to them. *See Dardeen v. Kuehling*, 821 N.E.2d 227, 233 (Ill. 2004). And the TAC implies that if NaphCare had a duty to preserve records under the statute discussed above, it would be "in spite of [its] contract with the State of Illinois." (TAC ¶¶ 29, 31 at 18, Dkt. No 83.)

In sum, Harris has failed to plead the required duty element of the spoliation claim against NaphCare. Count V is therefore dismissed.

### C. Counts III and IV—IDOC Defendants' Duty to Preserve Evidence

IDOC Defendants also argue that Harris has failed to plead sufficiently the duty element of the spoliation claim against them. They argue that the allegation that they owed a duty to preserve medical records pursuant to Wexford's or NaphCare's contracts with the State of Illinois

is insufficient because Harris does not point to any contract language creating such a duty and neither IDOC Defendants nor Harris were parties to the contracts. IDOC Defendants also argue that no duty is created under 735 ILCS 5/8-2001 because the statute governs only access to medical records and it does not apply to IDOC Defendants because they are not healthcare providers.

*Dardeen v. Kuehling*, 821 N.E.2d 227 (Ill. 2004), clarifies under what circumstances a contract can impose a duty to preserve evidence. In that case, a homeowner had a contract with the insurer. The central issue was whether such a contract could impose a duty on the insurer to preserve evidence that might be relevant to a potential personal injury claim by someone injured on the homeowner's property. *Id.* at 331. The *Dardeen* court concluded that the insurer had no such duty. In reaching this decision, the court noted that a duty to preserve evidence could arise under an agreement or contract, but the agreement or contract should be between the parties to the spoliation claim. *Id.* at 232. However, the court also noted that there was no contract in the record (this was a case decided at the summary judgment stage) and there were no arguments made that the contract contained a provision under which the insurer owed a duty to a homeowner to preserve evidence, much less a provision under which someone injured on the homeowner's property would be a third-party beneficiary. *Id.* Thus, the court left open a possibility that a third-party beneficiary of a contract imposing a duty to preserve evidence on a defendant might be able to bring a spoliation claim.

This Court need not resolve this issue, however, as the TAC fails to allege any factual basis from which it could be inferred that Wexford's or NaphCare's contracts with the State of Illinois impose a duty on IDOC to preserve records or that such a duty is owed to Green (for example, as a third-party beneficiary to the contracts). Given that the general rule holds that a

17

contract must be between the parties to the spoliation claim in order for a duty under the contract

to exist, the Court cannot reasonably infer that the referenced contracts imposed a duty on IDOC

Defendants to preserve Green's records. This conclusion is further supported by a strong

presumption under Illinois law against conferring benefits to non-contracting third parties. *See,*

*e.g.*, *Barry v. St. Mary's Hosp. Decatur*, 68 N.E.3d 964, 976 (Ill. App. Ct. 2016); *see also Hall-*

*Moten v. Smith*, No. 05-cv-5510, 2009 WL 1033361, at *8 (N.D. Ill. Apr. 17, 2009) (holding that

an inmate was not an intended beneficiary of Wexford's contract with IDOC).

Moreover, as noted above for the negligent spoliation claim against NaphCare, the statute

cited by Harris does not impose a duty to preserve records. Harris also fails to allege any special

circumstance or voluntary undertaking that would impose a preservation duty on IDOC

Defendants. Harris only alleges that at some point one of the IDOC Defendants produced

incomplete dialysis records. (TAC ¶ 29 at 13, Dkt. No. 83.) But mere possession and control of

evidence is not sufficient to establish a duty to preserve evidence. *See Martin v. Keeley & Sons,*

*Inc.*, 979 N.E.2d 22, 31 (Ill. 2012) (finding that "something more than possession and control are

required, such as a request by the plaintiff to preserve the evidence and/or the defendant's

segregation of the evidence for the plaintiff's benefit"). Therefore, Harris has failed to allege that

IDOC Defendants owed a duty to preserve Green's medical records, and Counts III and IV are

dismissed.

**CONCLUSION**

For the reasons stated above, NaphCare's motion to dismiss (Dkt. No. 86) is granted; Count V of the TAC is dismissed without prejudice. Wexford Defendants' motion to dismiss (Dkt. No. 89) is granted in part and denied in part; Counts I and VIII are dismissed without prejudice, while Counts II, VI, and IX survive. And finally, IDOC Defendants' motion to dismiss (Dkt. No. 100) is granted; Counts III and IV are dismissed without prejudice. Harris will be granted leave one more time to file a further amended complaint that attempts to cure the pleading deficiencies discussed in this Memorandum Opinion.

ENTERED:

Dated: October 6, 2017

Andrea R. Wood
United States District Judge