**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

KNIEAKAY T. HARRIS, as independent )
administrator of the estate of GERALD )
ANDRE GREEN, )
                         )
        Plaintiff, )
                         )       No. 15-cv-10936
      v. )
                         )       Judge Andrea R. Wood
WEXFORD HEALTH SOURCES, INC., et al., )
                         )
      Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiff Knieakay T. Harris filed this civil rights suit as the independent administrator of the estate of Gerald Andre Green. In March 2014, two days before Green was scheduled to be released from custody at Stateville Correctional Center ("Stateville"), an ambulance transported him to Presence St. Joseph Medical Center ("St. Joseph") in Joliet, Illinois. Green died at St. Joseph several days later, due to various complications from renal failure and hypertension. Harris has brought several claims under 42 U.S.C. § 1983 and Illinois state law against the following Stateville officials and healthcare providers: Wexford Health Sources, Inc. ("Wexford"), Randy Pfister, Michael Magana, Bernadette Ononiwu, R.N., Ghaliah Obaisi as independent executor of the estate of Dr. Saleh Obaisi, and Tunji Alausa, M.D. (collectively, "Defendants") (Fourth Am. Compl., Dkt. No. 113.). Defendants retained two expert physicians who provided reports opining that Defendants were not at fault for Green's death. (*See* Pl.'s Mot. to Bar Defs.' Expert Witnesses Drs. Tubbs & Leehey Pursuant to *Daubert v. Merrell Dow* ("Daubert Mot."), Ex. A, Dkt. No. 214-1; *id.*, Ex. B, Dkt. No. 214-2.) Harris now moves pursuant to Federal Rule of Civil Procedure 26(a), Federal Rule of Evidence 702, and *Daubert v. Merrell Dow Pharmacy, Inc.*, 509 U.S. 579

(1993), to exclude certain statements contained in the physicians' reports. (Daubert Mot., Dkt. No. 214.) For the reasons provided below, the motion is denied.

## BACKGROUND

Harris alleges that in the early morning of March 19, 2014, an unknown Wexford nurse took Green to Nurse Ononiwu because he was having chest pain and difficulty breathing. (Fourth Am. Compl. ¶ 21.) Nurse Ononiwu called Dr. Obaisi, who was then the medical director at Stateville. (*See* Daubert Mot., Ex. C, Dep. of Bernadette Ononiwu, R.N. ("Ononiwu Dep.") 151:10–152:11, Dkt. No. 214-3.) When Dr. Obaisi did not answer, Nurse Ononiwu called another doctor, who told her to send Green to St. Joseph. (*Id.*) According to Harris, Nurse Ononiwu then started Green on a saline infusion by intravenous drip ("IV"). (Fourth Am. Compl. ¶ 23.) Nurse Ononiwu disputes that she administered Green's IV (Ononiwu Dep. 159:8–15), but she acknowledges that she took notes on Green's vitals while waiting for his ambulance to arrive, including a note that his IV was infusing liquids. (*Id.* 175:9–21.) At 2:50 a.m.—approximately 45 to 50 minutes after Green's IV started—an ambulance transported him to St. Joseph. (Fourth Am. Compl. ¶ 25.) Green arrived at the hospital unconscious and in cardiac arrest, and St. Joseph medical professionals were never able to revive him. (*Id.* ¶ 26.) He died five days later, on March 24, 2014. (*Id.* ¶ 14.) The Will County Medical Examiner listed anoxic brain damage, cardiac arrest, and pulmonary edema—or excess fluid in the lungs—as his causes of death. (*Id.* ¶ 15.) Green had suffered from serious renal failure and hypertension since at least 2012. (*Id.* ¶ 16.) But Harris alleges that Nurse Ononiwu's saline infusion exacerbated his underlying medical issues and ultimately led to his death. (*Id.* ¶ 37.)

To rebut Harris's medical expert, Anis Rauf, D.O., Defendants have disclosed expert reports from Dr. Kennon Tubbs, M.D., CCHP-P, and Dr. David J. Leehey, M.D., who reviewed

the underlying medical records and determined that Defendants acted reasonably in treating Green and were not responsible for his death. (*See* Daubert Mot., Ex. A, Expert Report of Kennon Tubbs, M.D., CCHP-P ("Tubbs Report"), Dkt. No. 214-1; *id.*, Ex. B, Expert Report of David J. Leehey, M.D. ("Leehey Report"), Dkt. No. 214-2.) Dr. Tubbs is a family practice physician who has worked at the Utah State Prison for 15 years and currently serves as the medical director for eleven county jails in Utah and Wyoming. (Tubbs Report at 1.) Dr. Leehey is a Professor of Medicine and Nephrology at Loyola University of Chicago Medical Center who has practiced in the area of nephrology for nearly 40 years. (Leehey Report at 1–2.) Harris elected not to depose Dr. Tubbs or Dr. Leehey. (Daubert Mot. at 1.)

Harris seeks to exclude certain opinions of Defendants' experts, claiming that they failed to comply with the disclosure requirements of Federal Rule of Civil Procedure 26(a)(2) and based their opinions on unreliable science. Specifically, Harris challenges the following four opinions: (1) Dr. Tubbs's opinion that Green outlived his life expectancy by two years; (2) Dr. Tubbs's and Dr. Leehey's estimates on the amount of saline solution infused into Green by IV before an ambulance transported him to St. Joseph; (3) Dr. Tubbs's statement that Nurse Ononiwu did not place the IV into Green; and (4) Dr. Tubbs's opinion that a heart attack may have been the ultimate cause of Green's death.

## DISCUSSION

Under Federal Rule of Civil Procedure 26(a)(2)(B), retained experts such as Dr. Tubbs and Dr. Leehey must disclose to the opposing party complete statements of the opinions to which they intend to testify and the facts or data upon which they relied in forming their opinions. *See also* Fed. R. Civ. P. 26(a)(2)(B) advisory committee's notes to 1993 amendment (requiring that an expert provide a "detailed and complete written report," and noting that before the amendment, an

expert's disclosure "was frequently so sketchy and vague that it rarely dispensed with the need to depose the expert"). "A complete report must include the substance of the testimony which an expert is expected to give on direct examination together with the reasons therefor." *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 641 (7th Cir. 2008) (quoting *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 741 n.6 (7th Cir. 1998)). Such reports should also offer and cite any data or publications upon which the expert bases their opinions. *Cent. States, Se. & Sw. Areas Health & Welfare Fund v. Haynes*, No. 17 C 6275, 2018 WL 8265243, at *2 (N.D. Ill. Oct. 24, 2018).

"The admission of expert testimony is governed by Federal Rule of Evidence 702 and the principles outlined in *Daubert*." *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011). Under the *Daubert* standard, the district court acts as a gatekeeper to "ensure the reliability and relevancy of expert testimony." *Naeem v. McKesson Drug Co.*, 444 F.3d 593, 607 (7th Cir. 2006) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 153 (1999)). In addition, Rule 702 provides that a qualified expert may testify as to his opinion if his specialized knowledge will help the trier of fact to determine a fact in issue, his testimony is based on sufficient facts or data and is the product of reliable methods, and the expert has reliably applied those methods to the facts of the case. Fed. R. Evid. 702. Accordingly, the district court engages in a three-step analysis before admitting expert testimony. *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). "It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* (internal quotation marks and citation omitted). But this gatekeeping responsibility "does not render the district court the trier of all facts relating to expert testimony. . . . The jury must still be allowed to play its essential role as the arbiter of the weight and credibility of expert testimony." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771,

780 (7th Cir. 2017) (quoting *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013)). While "'shaky' expert testimony may be admissible, subject to attack on cross-examination," the district court has an obligation to exclude any testimony that crosses the line from shaky to unreliable. *Bielskis*, 663 F.3d at 894 (citation omitted).

Courts look at several factors to determine whether experts' principles and methods are reliable, such as whether the methods can be and have been tested, whether they have been subject to peer review, whether they have a known error rate, and whether they are generally accepted in the relevant scientific community. *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013) (citing *Daubert*, 509 U.S. at 593–94). The advisory committee's notes to the 2000 amendment of Rule 702 suggests a few additional factors to consider, including "[w]hether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion" and "[w]hether the expert has adequately accounted for obvious alternative explanations." *See also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). Finally, an expert must "substantiate his opinion; providing only an ultimate conclusion with no analysis is meaningless." *Huey v. United Parcel Serv., Inc.*, 165 F.3d 1084, 1087 (7th Cir. 1999) (citation omitted).

## I.     Dr. Tubbs's Opinion Regarding Green's Life Expectancy

In his report, Dr. Tubbs opines, in relevant part:

> According to the United States Renal Data System (USRDS) 2009 report the expected survival of a 55-year-old person on dialysis is only 5 years. The mean survival for all people in America who start dialysis is 3 years. Mr. Green survived seven years on hemodialysis. It is reasonable to assume that he was able to survive so long due to the excellent dialysis care he received while incarcerated.

(Tubbs Report at 4.) Dr. Tubbs goes on to remark that, according to one study, nocturnal dialysis is associated with significantly lower mortality rates, which "could presumably be why Mr. Green

underwent dialysis at 2 am rather than during the daytime hours." (*Id.*) Dr. Tubbs concludes that Green "outlived his life expectancy by two years." (*Id.*)

Harris first argues that Dr. Tubbs is not qualified under Rule 702 to offer opinions on the life expectancy of individuals receiving nephrological care because he is a general family physician. (Daubert Mot. at 7.) "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony." *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010) (quoting *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990)). A medical degree is not sufficient to deem a witness "qualified to opine on all medical subjects." *Id.* at 617. But "courts often find that a physician in general practice is competent to testify about problems that a medical specialist typically treats." *Id.* (reversing the district court's finding that a physician without cardiac-specific training was unqualified "to testify as an expert in a case involving a heart-related death"). As the Seventh Circuit noted in *Gayton*, "[t]he question we must ask is not whether an expert witness is qualified in general, but whether his qualifications provide a foundation for him to answer a specific question." *Id.* (internal quotation marks, alterations, and citations omitted). Though Dr. Tubbs is a general physician, he has worked in the jail system for more than 15 years, and it is likely he has significant experience with medical issues common among the general population, including kidney disease. Thus, the Court finds that Dr. Tubbs is sufficiently qualified to serve as an expert witness.

Next, Harris argues that the Court should exclude Dr. Tubbs's references to the 2009 USRDS report and the study concerning nocturnal dialysis pursuant to Federal Rule of Civil Procedure 26(a)(2)(B) because Dr. Tubbs did not include the full reports in his disclosures. But Rule 26(a)(2)(B) does not require "that the expert attach to his report every publication he cites."

*Kesse v. Ford Motor Co.*, No. 14-cv-6265, 2020 WL 832363, at *6 (N.D. Ill. Feb. 20, 2020). "The purpose of the report is to provide adequate notice of the substance of the expert's forthcoming testimony and to give the opposing party time to prepare for a response." *Meyers v. Nat'l R.R. Passenger Corp. (Amtrak)*, 619 F.3d 729, 734 (7th Cir. 2010) (citations omitted). As to the USRDS report, Dr. Tubbs provides the source and year of publication (Tubbs Report at 4), which is sufficient for Harris's counsel to obtain their own copy of the report and prepare for cross-examination.[1] Additionally, there is a full citation to the study concerning nocturnal dialysis included on the final page of Dr. Tubbs's report, below his signature. (*See id.* at 6 (citing John B. Stokes, M.D., *Consequences of Frequent Hemodialysis: Comparison to Conventional Hemodialysis and Transplantation*, 122 Transactions Am. Clinical & Climatological Ass'n 124–36 (2011)).) The Court finds that Dr. Tubbs's references to these two studies provide Harris sufficient notice of their contents and thus comply with Rule 26.

Aside from any disclosure issues, Harris argues that Dr. Tubbs's statement concerning Green's life expectancy should be excluded under *Daubert* and Rule 702 as lacking scientific rigor. Specifically, Dr. Tubbs generalizes that because the average expected survival of a 55-year old person on dialysis is five years, Green's survival of seven years on dialysis shows that he outlived his life expectancy by two years. As Harris points out, "Green was ***42 years old*** and on ***hemodialysis*** at the time of his death." (Daubert Mot. at 7 (emphasis provided).) Essentially, Harris argues that Dr. Tubbs's estimation of Green's life expectancy constitutes an unjustifiable extrapolation from the study Dr. Tubbs cites. *See* advisory committee's notes to the 2000 amendment of Federal Rule of Evidence 702. For instance, in *C.W. ex rel. Wood v. Textron, Inc.*, the Seventh Circuit affirmed the exclusion of a doctor's expert opinion that the plaintiffs'

---

[1] Moreover, if Harris's counsel is nonetheless unable to obtain a copy of the report, the Court would consider it reasonable for Harris's counsel to ask Defendants' counsel for access to the report and would expect Defendants' counsel to oblige.

immunological and neurological issues were the result of their exposure as children to a toxic gas released by the defendant's nearby manufacturing plant. 807 F.3d 827, 836–38 (7th Cir. 2015). The expert's opinion relied on studies that showed how high doses of the gas could cause damage to the immune and nervous systems. *Id.* at 832. However, the studies did not involve children subjects or exposure levels similar to the plaintiffs'. *Id.* at 837. The court noted that though the expert was not required to find a study of individuals at the exact age of the plaintiffs, exposed to exact same amounts of the gas, he did need to "connect the dots from the studies to the illnesses endured by the children" using a valid method of extrapolation. *Id.; see also In re Zimmer Nexgen Knee Implant Prods. Liab. Litig.*, 218 F. Supp. 3d 700, 714 (N.D. Ill. 2016) (granting the defendant's motion to exclude a doctor's expert testimony pursuant to Rule 702 and *Daubert* because the doctor "provide[d] almost no explanation of how the sources he reviewed support his conclusions.").

In the present case, the differences between Green and the subjects of the USRDS study— Green being thirteen years younger than those subjects and on hemodialysis rather than dialysis— may be significant. *See generally* Stanley S.A. Fenton M.D. et al., *Hemodialysis Versus Peritoneal Dialysis: A Comparison of Adjusted Mortality Rates*, 30 Am. J. Kidney Diseases 334– 42 (1997). And like the expert in *C.W.*, Dr. Tubbs has not provided many details about how he extrapolated Green's life expectancy from the subjects of the USRDS study. However, the Court is reluctant to exclude Dr. Tubbs's opinion without more information on his methodology, particularly since he has not had the opportunity to testify in a deposition (which would be the most direct way for Harris to test the connection between the study and Dr. Tubbs's conclusions or expose the lack thereof). It may be that the apparent gap between Dr. Tubbs's research and Green can be remedied via rigorous cross-examination. *See Bielskis*, 663 F.3d at 894.

Accordingly, the Court will deny Harr's motion to exclude Dr. Tubbs's opinion based on the current record and instead require that Dr. Tubbs provide a more detailed disclosure of the methodology he used to estimate Green's life expectancy.

## II.     Dr. Tubbs' and Dr. Leehey's Opinions Regarding the Volume of Green's Saline Solution Infusion

Dr. Tubbs and Dr. Leehey both offer opinions regarding the amount of fluid that Nurse Ononiwu, or another healthcare official, infused into Green via an IV. Dr. Tubbs writes:

> Records show that an IV was placed and that it was "infusing." This is more likely that the writer of the note was indicating that the IV was open and available if needed for this life saving medications. In most code situations once IV access is obtained the IV is ran at "TKO" to keep open status. The standard drip rate for a TKO IV line is one that flows between 25 and 50 cc/hr. Given that the IV was placed at 0207 and he was transported at 0250 a reasonable guess would be that Green received approximately 30 ml of saline solution. This correlates to less than one ounce of fluid. In addition the care was so reasonable that the ambulance required use of the IV when Green underwent a cardiac arrest in the ambulance. Had this IV not been kept open and flowing it is likely that Mr. Green could have died in the ambulance having not been able to receive resuscitative medication through the IV.

(Tubbs Report at 4.) Dr. Leehey opines:

> From my reading of the record, the purpose of infusing 0.9% saline was to keep the line open for possible intravenous medication administration and not to administer fluids to the patient. The documentation does not indicate how much saline was infused into Mr. Green, but in my opinion it is likely that only a small amount of saline was given in the 50 minutes that the patient was in the prison emergency room. Thus I believe that it is more likely than not that any saline infused under the care of Nurse Ononiwu did not contribute to the death of Mr. Green, and she did not otherwise contribute to the death of the patient.

(Leehey Report at 2.)[2] Both experts offer essentially the same three opinions: (1) that Green's IV was not started in order to transfer liquids but simply to keep his vein open; (2) that a small amount of liquid—around one ounce—was infused into Green before he was transported to St.

---

[2] Harris does not contest that, as an experienced nephrologist, Dr. Leehey is qualified to offer an expert opinion under Rule 702.

Joseph; and (3) that the volume of liquid infused into Green did not contribute to his death and may have actually prevented his earlier death.

Harris argues that Dr. Tubbs's and Dr. Leehey's opinions inexcusably overlook facts in the record. First, Nurse Ononiwu testified that she believed infusing saline solution into a patient like Green, who was suffering from very high blood pressure, would help the patient by lowering his blood pressure. (*See* Ononiwu Dep. 193:9–21.) Thus, Harris contends that it is likely Nurse Ononiwu or a member of her staff infused Green's IV in order to administer liquids, and not merely to keep the line open. Second, Nurse Ononiwu testified that she could not remember the rate of the IV transfusion into Green. (*Id.* 201:20–202:3.)

In determining whether expert testimony is sufficiently reliable, courts should consider "[w]hether the expert has adequately accounted for obvious alternative explanations." Fed R. Evid. 702 advisory committee's note to 2000 amendment; *see also Gopalratnam*, 877 F.3d at 787 (affirming district court's exclusion of expert testimony, in part because the expert "failed to account for other possible explanations in arriving at his conclusion"). A court may decide to exclude expert evidence that is simply inconsistent with the factual record. *See Second Amendment Arms v. City of Chicago*, No. 10-cv-4257, 2020 WL 1157347, at *9 (N.D. Ill. Mar. 10, 2020) (excluding an expert report concerning lost profits that "was based on implausibly optimistic assumptions" and was undermined by the facts before the court).

The Court finds that Dr. Tubbs's and Dr. Leehey's intended testimonies about the purpose and volume of the liquid administered to Green are sufficiently reliable to proceed before the factfinder. As Harris points out, there are facts in the record inconsistent with Defendants' expert testimony. Nurse Ononiwu's deposition testimony and her handwritten note that an IV was infusing liquids could support a finding that Green's IV was started specifically to administer

fluids, and not merely to keep his vein open for emergency responders. But the record on that point is not so clear that Dr. Tubbs's and Dr. Leehey's testimony should be excluded out of hand as unreliable. As physicians who have reviewed Green's medical record and the notes of Stateville's medical staff, they can provide testimony based on their experience about common notetaking and IV transfusion practices in their profession.

As to the experts' second point—that only a small amount of liquid was transfused to Green—their testimonies are not necessarily inconsistent with the factual record. It is true that Nurse Ononiwu testified she did not know the IV's transmission rate or volume of liquid. However, the record shows that the IV was in place from approximately 2:07 to 2:50 am. Thus, it is likely that an expert familiar with typical transmission rates and the ordinary standard of care for such situations would be able to provide a fair estimate of the amount of liquid transferred, based on the length of time the IV was in place. Accordingly, Harris's motion to exclude the expert testimony of Dr. Tubbs and Dr. Leehey is denied with respect to their opinions concerning Green's IV infusion.

### III. Dr. Tubbs's Statement Regarding Who Administered Green's IV

Harris also seeks to bar the following statement, included in Dr. Tubbs's report: "Nurse Ononiwu did not place the IV per her deposition. An IV was placed by the resuscitation team in the event it was needed." (Tubbs Report at 4.) Harris disputes Nurse Ononiwu's claim that she did not administer Green's IV. (*See* Daubert Mot. at 13.)

District courts are required to bar experts' subjective beliefs, *see Clark v. Takata Corp.*, 192 F.3d 750, 757 (7th Cir. 1999), which would include their beliefs about the credibility of fact witnesses. But by specifying that "per her deposition," Nurse Ononiwu did not administer Green's IV, Dr. Tubbs avoids any prejudice to Harris. Rather, he is simply providing the basis for the

conclusions he has reached. And, at trial, Dr. Tubbs may readily be cross examined regarding the reliability of a party's testimony as the basis for his opinions. Similarly, in *United States v. Diekhoff*, the Seventh Circuit found that the district court did not abuse its discretion by allowing an expert psychologist to repeat the criminal defendant's statement "I knew it was wrong" when she opined on his mental state. 535 F.3d 611, 620 (7th Cir. 2008). The court concluded that the expert's testimony was not unduly prejudicial, because she provided "no embellishment to the statement indicating whether [she] thought this showed sanity or insanity." *Id.* The Court trusts that here the factfinder will interpret Dr. Tubbs's statement as a simple recounting of Ononiwu's position. Presumably, Nurse Ononiwu will testify at trial consistent with her deposition testimony and the jury will hear the same statement directly from her. If that turns out not to be the case, Harris may request an appropriate ruling limiting the introduction of Nurse Ononiwu's out-of-court statement through Dr. Tubbs at that time. Accordingly, the motion to exclude is denied as to Dr. Tubbs's statement concerning whether Ononiwu administered Green's IV.

### IV. Dr. Tubbs's Opinion that Green May Have Suffered a Heart Attack

Lastly, Harris challenges Dr. Tubbs's assertion that Green may have suffered a heart attack at the end of his life. The relevant section of Dr. Tubbs's expert report provides:

> Mr. Green presented in hypertensive crisis with blood pressure of 260/140. He had accompanying complaints of vomiting, chest pain, shortness of breath and low oxygen saturations. It is possible that Mr. Green was suffering a heart attack despite evidence of coronary artery occlusion on autopsy. Mr. Green has significant risk factors for heart disease and this cannot be excluded as the cause of his death. It is certainly incumbent upon the nursing team and nurse Ononiwu to consider heart attack as a possibility and obtain IV access in preparation for transport in case of an acute arrest.

(Tubbs Report at 5.) Harris argues that by proposing that Green may have died of a heart attack, Dr. Tubbs ignores the relevant medical evidence showing that Green's death was caused by a pulmonary edema and "makes a stab in the dark opining without any supporting facts." (Daubert

Mot. at 14.) But Dr. Tubbs's report points directly to the facts upon which he bases his opinion, including Green's blood pressure, vomiting, chest pain, shortness of breath, and oxygen levels. Additionally, this is not a case where the expert's opinion fails to account for other obvious explanations. *See* Fed R. Evid. 702 advisory committee's note to 2000 amendment; *Gopalratnam*, 877 F.3d at 787. To the contrary, Dr. Tubbs's report acknowledges that Green was suffering from an acute pulmonary edema when he was transferred to St. Joseph. (Tubbs Report at 5.) Still, Dr. Tubbs proposes that based on Green's symptoms, he may ultimately have died of a heart attack. If Harris disagrees with how Dr. Tubbs has applied his medical knowledge to the facts of the case, she may address that on cross-examination. The motion to exclude is denied as to Dr. Tubbs's opinion regarding Green's cause of death.

## CONCLUSION

For the reasons provided above, Harris's *Daubert* motion to exclude expert testimony from Dr. Tubbs and Dr. Leehey (Dkt. No. 214.) is denied. However, the Court directs that by April 20, 2021, Dr. Tubbs shall supplement his report to explain how he estimated Green's life expectancy on hemodialysis based on the studies cited.

ENTERED:

Dated: March 30, 2021

_____
Andrea R. Wood
United States District Judge