IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KNIEAKAY T. HARRIS, as independent administrator of the estate of, GERALD ANDRE GREEN, | |
| Plaintiff, | No. 15 cv 10936 |
| vs. | Honorable Andrea R. Wood |
| WEXFORD HEALTH SOURCES, INC., et al | Magistrate Judge Heather K. McShain |
| Defendants. | |

**MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

NOW COMES the plaintiff, Knieakay T. Harris, by and through her attorneys, Matthias D. Gill and Wilton A. Person, and pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.1(b)(2) presents the following Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment.

**I. INTRODUCTION**

This case involves claims for civil rights violations (8th Amendment) and Wrongful Death claims under Illinois law related to the death of Gerald Andre Green on March 24, 2014. Ample facts exist in the record to defeat Defendants' Motion for Summary Judgment on all issues for which Defendants move.

**II. STANDARD OF REVIEW**

Summary judgment is appropriate when the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The nonmovant must point to admissible evidence in the record to show that a genuine dispute exists. The mere existence of a factual dispute is insufficient to overcome a motion for summary

1

judgment; the nonmovant "must present definite, competent evidence in rebuttal." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012). "In a § 1983 case, the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forward with sufficient evidence to create genuine issues of material fact to avoid summary judgment." *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010). All facts, and any inferences to be drawn from them, must be viewed in the light most favorable to the non-moving party. *Wis. Cent., Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008).

### III. ARGUMENT

**A. Sufficient Material Fact Exists to Prove that Bernadette Ononiwu Violated Mr. Green's 8th Amendment Rights.**

The Eighth Amendment, through the Fourteenth Amendment, imposes a duty upon states to provide adequate medical care to incarcerated individuals. See, e.g., *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006). Every claim by a prisoner that he has not received adequate medical treatment is not a violation of the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 105, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). But the Eighth Amendment safeguards the prisoner against a lack of medical care that "may result in pain and suffering which no one suggests would serve any penological purpose." Id. at 103, 97 S.Ct. 285. "To determine if the Eighth Amendment has been violated in prison medical context, the Court performs a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016).

**1. Gerald Green presented with an Objectively Serious Medical Condition**

A serious medical condition is characterized by "the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain."

2

*Hayes v. Snyder*, 546 F.3d 516, 523 (7th Cir. 2008). A condition could also be objectively serious if a "failure to treat it could result in the unnecessary and wanton infliction of pain." *Id.* at 522. The Seventh Circuit has found that "a broad range of medical conditions may be sufficient to meet the objective prong of a deliberate indifference claim, including a dislocated finger, a hernia, arthritis, heartburn and vomiting, a broken wrist, and minor burns sustained from lying in vomit." *Roe v. Elyea*, 631 F.3d 843, 861 (7th Cir. 2011).

Gerald Green had a documented history of end stage renal disease, hypertension, and received frequent dialysis at Stateville Correctional Center. The parties do not dispute that Gerald Andre Green's hypertension and end stage renal disease were serious medical conditions. (See **Response to Defendants' SOF**, 38).

## 2. Bernadette Ononiwu was Deliberately Indifferent to Gerald Green's Serious Medical Condition

To show deliberate indifference, "a plaintiff must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Petties*, 836 F.3d at 728. Showing mere negligence is not enough. Even objective recklessness—failing to act in the face of an unjustifiably high risk that is so obvious that it should be known—is insufficient to make out a claim." *Id.* Rather, "the defendant must know of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference." *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016).

Where a defendant "denies knowing that he was exposing a plaintiff to a substantial risk of serious harm, evidence from which a reasonable jury could infer a doctor knew he was providing deficient treatment is sufficient to survive summary judgment." *Petties*, 836 F.3d at 726. "A medical professional acting in his professional capacity may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base

3

the decision on such a judgment." *Rasho v. Elyea*, 856 F.3d 469, 476 (7th Cir. 2017). Put another way, a medical professional's response must be "so inadequate that it demonstrates an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances." *Collignon v. Milwaukee Cnty.,* 163 F.3d 982, 989 (7th Cir. 1998).

Evidence that "some medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim." *Petties*, 836 F.3d at 729; by definition a treatment decision that is based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment. *Id.* Even among the medical community, the permissible bounds of competent medical judgment are not always clear, particularly because "it is implicit in the professional judgment standard itself ... that inmate medical care decisions must be fact-based with respect to the particular inmate, the severity and stage of his condition, the likelihood and imminence of further harm and the efficacy of available treatments." *Roe v. Elyea*, 631 F.3d 843, 859 (7th Cir. 2011).

Another situation that might establish a departure from minimally competent medical judgment is where a prison official persists in a course of treatment known to be ineffective. *Petties v. Carter*, 836 F.3d 722 (7th Cir. 2016). An Eighth Amendment claim may exist if medical treatment is so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition. *Kelley v. McGinnis*, 899 F.2d 612, 616–17 (7th Cir. 1990).

Yet another type of evidence that can support an inference of deliberate indifference is an inexplicable delay in treatment which serves no penological interest. *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008). To show that a delay in providing treatment is actionable under the Eighth Amendment, a plaintiff must also provide independent evidence that the delay exacerbated the injury or unnecessarily prolonged pain. *Williams v. Liefer*, 491 F.3d 710, 716 (7th Cir. 2007) (delay actionable where medical records showed it unnecessarily prolonged plaintiff's pain and high

4

blood pressure; *Gil v. Reed*, 381 F.3d 649, 662 (7th Cir. 2004) (hours of needless suffering can constitute harm).

The notion that the provision of some care does not mean that a healthcare provider provided medical treatment which meets the basic requirements of the Eighth Amendment. *Petties v. Carter*, 836 F.3d 722 (7th Cir. 2016). Rather, the context surrounding a treatment decision can sometimes override a healthcare provider's claimed ignorance of the risks stemming from that decision. *Id.*

When a healthcare professional says they did not realize treatment decisions (or lack thereof) could cause serious harm to a plaintiff, a jury is entitled to weigh that explanation against certain clues that the healthcare provider did know. *Id.*

While evidence of malpractice is not enough for a plaintiff to survive summary judgment on an Eighth Amendment claim, nor is a healthcare professional's claim they did not know any better sufficient to immunize him from liability in every circumstance. *Id.* Otherwise, prison healthcare professionals would get a free pass to ignore prisoners' medical needs by hiding behind the precedent that medical malpractice is not actionable under the Eighth Amendment. *Id.*

Prisoners are not entitled to state-of-the art medical treatment. *Id.* But where evidence exists that the defendants knew better than to make the medical decisions that they did, a jury should decide whether or not the defendants were actually ignorant to risk of the harm that they caused. *Id.*

A court looks at the "totality of an inmate's medical care when considering whether that care evidences deliberate indifference to serious medical needs." *Id.* If a prison healthcare provider chooses an easier and less efficacious treatment without exercising professional judgment, such a decision can also constitute deliberate indifference." *Id.* at 730. Notably, for a prison official's acts to constitute deliberate indifference, "a plaintiff does not need to show that the official intended harm or believed that harm would occur. *Id.* at 728.

Rarely, if ever, will an official declare, "I knew this would probably harm you, and I did it anyway!" Most cases turn on circumstantial evidence, often originating in a healthcare provider's failure to conform to basic standards of care. While evidence of medical malpractice often forms the basis of a deliberate indifference claim, the Supreme Court has determined that plaintiffs must show more than mere evidence of malpractice to prove deliberate indifference. *Petties v. Carter*, 836 F.3d 722 (7th Cir. 2016) at 728, citing in part, *Estelle*, 429 US at 106, 97 S.Ct. 285. Blatant disregard for medical standards could support a finding of mere medical malpractice, or it could rise to the level of deliberate indifference, depending on the circumstances. *Id.*

Nurse Ononiwu's testimony is a murky swamp within which we are forced to wade. During her deposition, she habitually interrupted questions, provided narrative answers, contradicted herself, and doubled back on her version of events. (See **Exhibit A** to Defendants' Statement of Facts, generally). A jury should be the proper fact finder to determine Nurse Ononiwu's credibility, the medical competence that she exhibited on March 19, 2014, and her awareness of the risk of harm that she provided to Mr. Green. Like *Petties*, this is a case that will turn on circumstantial evidence that will require a fact finder to assess Nurse Ononiwu's testimony. Defendants' Statement of Facts restates some of Nurse Ononiwu's narratives for that night while leaving out the bulk of her contradictory statements, her knowledge of proper nursing practice, and her awareness of the risk of harm that she exposed Mr. Green to that night.

In the early morning hours of March 19, 2014, Nurse Ononiwu knew that Gerald Andre Green was suffering from shortness of breath, was a dialysis patient with end stage renal disease, and that his vital signs were terrible. (See **Plaintiff's SOAF**, 10). At the very least, she documented her awareness of a saline solution that was "infusing" or "still infusing" from 2:07A.M. to 2:50A.M. when Mr. Green left in an ambulance. (See **Plaintiff's SOAF**, 5, 10, 14, 15).

6

Nurse Ononiwu denied (at great length) being the nurse that put the IV into Mr. Green's arm and beginning the saline infusion. (See **Response to Defendants' SOF**, 27-31). However, again, she admitted to being aware that it was ongoing throughout her assessments during the 43 minutes she was with Mr. Green. (See **Plaintiff's SOAF**, 5, 6, 9, 10, 14, 15). When faced with her documented knowledge of the saline infusion, she then testified that adding saline to an ESRD patient would reduce their blood pressure and not raise it. (See **Plaintiff's SOAF**, 16).

Mr. Green first was seen by dialysis technician Lucinia Martin. Mr. Green was, at that time, talking and walking under his own power. (See **Plaintiff's SOAF**, 7). Ms. Martin testified that Nurse Ononiwu was alone in the urgent care portion of the healthcare unit and without any other patients. (See **Plaintiff's SOAF**, 8).

A jury could conclude from the evidence that Nurse Ononiwu was alone with Mr. Green, started the IV, documented the encounter, called for an ambulance, and otherwise continued to assess him as the infusing fluids exacerbated his condition over 43 minutes.

Nurse Ononiwu could not provide any identifying information of the "team" that allegedly helped her care for Mr. Green. (See **Plaintiff's SOAF**, 22, 23, 24). Wexford did not express any interest in advancing her narrative in this regard and stipulated that none of their possible employees would be able to testify accordingly in response to discovery pressure. (See **Plaintiff's SOAF**, 25).

Defendants' experts attempted to clean up Nurse Ononiwu's testimony and documentation that she was "still infusing" saline into Mr. Green for the 43-minute interval and went so far as to approximate that it was just an ounce of fluid. (See **Plaintiff's Response to Defendants' SOF**, 50, 52, 53, 56). However, a jury could determine that this is nonsense in light of the fact that the hospital pulled off 6.35 liters of fluid from Mr. Green following Nurse Ononiwu's infusion. (See **Plaintiff's SOAF**, 4). A jury could conclude that Nurse Ononiwu's 43-minute saline infusion in an

ESRD patient tipped Mr. Green over the edge, caused his heart attack in the ambulance minutes later, and led to his death. (See **Plaintiff's SOAF**, 6, 7, 8, 9, 10, 13, 15).

Dr. Rauf testified that patients with end stage renal disease must have dialysis to remove the fluids off their body. In such a patient, the body is like a bathtub without a drain. The more fluid that is added to the tub, the more the patient risks drowning in their own fluids. (See **Plaintiff's SOAF**, 17). Dr. Rauf testified that the only reasonable treatment for Mr. Green would have been emergent dialysis and that any competent nurse (if knowing Mr. Green's conditions of hypertension and ESRD) should have figured out that Mr. Green needed dialysis as quickly as possible. (See **Plaintiff's SOAF**, 18). Dr. Rauf has never given an order to give a saline infusion to a dialysis patient who appears to be volume overloaded. Any competent nurse or physician should know that an infusion of saline is improper. (See **Plaintiff's SOAF**, 20, 21).

Even Dr. McFadden, the prison contracted nephrologist agreed that the only treatment for Mr. Green was dialysis. (See **Plaintiff's SOAF**, 4). If he was called, Dr. McFadden would have told the nurses at Stateville to attempt dialysis. (See **Plaintiff's SOAF**, 19).

In essence, it is undisputed that Mr. Green was a sick man with serious health conditions, but a jury could find that she put the needle in his arm and filled him with enough saline to cause him to drown in his fluids and stop his heart. Plaintiff would ask the Court (and if possible, a jury) to consider what 6.35 liters of fluid actually looks like – it is more than three 2-liter soda bottles of fluid. (See **Plaintiff's SOAF**, 4). A jury could conclude that she likely infused more than Defendants' experts "ounce of fluid" within that 43-minute time frame as Mr. Green's condition deteriorated before her eyes.

A jury could conclude that Nurse Ononiwu opted for a course of action that no minimally competent professional would have chosen when she administered (or was aware of and documented as the urgent care nurse) a 43-minute saline infusion in an ESRD patient. (See

8

**Plaintiff's SOAF**, - 5, 17, 18, 20, 21; see also Nurse Ononiwu's March 19, 2014 notes, attached to **Plaintiff's SOAF, Exhibit 10**). A jury could conclude that the bells and whistles should have been going off in her head as his condition continued to deteriorate while the solution was still infusing. (See **Plaintiff's SOAF**, 6, 7, 13, 20).

A jury could conclude that she figured out, during her deposition, that the IV situation could be "bad for her" so she blamed other "phantom" nurses. A jury could conclude that she was trying to deflect from the seriousness of the situation (or "play dumb") when she boldly claimed that an IV saline solution would bring Mr. Green's blood pressure down instead of increase it. (See **Plaintiff's SOAF**, 16).

A jury could conclude that Nurse Ononiwu lacked even the most basic professional knowledge and mastery as she did not know basic medical terms that pertained to Mr. Green and his health conditions such as: "symptom," "chronic condition," "pulmonary edema," and volume overload. (See **Plaintiff's SOAF**, 12). Nurse Ononiwu did not even know if a nurse could administer an IV saline infusion without a doctor's order. (See **Plaintiff's SOAF**, 12(C)).

A jury could conclude that Nurse Ononiwu's lack of knowledge, her mistakes, her lack of any desire to address mistakes, and her failure to adhere to even the most basic understanding of nursing and medical care is precisely what Courts have tried to explain time and again that separates the 8th Amendment from medical negligence – "deliberate indifference" to the rights and fragile humanity of prisoners.

**B. The Seventh Circuit standard for punitive damages for a § 1983 claim is the same as the standard for liability.**

Defendants cite *Schaub v. VonWol*, an Eighth Circuit case to present a punitive damages standard that is not applicable to Seventh Circuit cases. 638 F.3d 905, 922-23 (8th Cir. 2011). Notably, the Defendants do not present a single case in the Seventh Circuit that supports this standard. As the Seventh Circuit has noted, the standard for punitive damages for a § 1983 claim is

9

the same as the standard for liability. *Woodward v. Corr. Med. Servs. of Ill., Inc.*, 368 F.3d 917, 930 (7th Cir. 2004). Accordingly, summary judgment is improper as to punitive damages when the factual record sufficiently establishes genuine issues of material fact with respect to Plaintiff's deliberate indifference claim against Nurse Ononiwu.

**C. Sufficient Material Fact Exists to Permit Plaintiff to prevail upon her Illinois Wrongful Death Act Count against Bernadette Ononiwu.**

To prevail in a medical malpractice action in Illinois, the plaintiff has the burden of proving (a) the proper standard of care for the defendant medical care provider, (b) failure to comply with the standard of care, and (c) a resulting injury proximately caused by the medical defendant's deviation from the standard of care. *Purtill v. Hess,* 111 Ill.2d 229, (1986).

As referenced above in the section pertaining to Nurse Ononiwu's alleged deliberate indifference and violation of Mr. Green's 8th Amendment rights, material factual disputes exist with respect to whether Defendant Nurse Ononiwu failed to comply with the standard of care and to what extent Mr. Green was injured by that care. The evidentiary record supports the denial of Defendants Motion for Summary Judgment with respect to Nurse Ononiwu and the Illinois Wrongful Death Act Count of the Fourth Amended Complaint.

Defendants argue in a hasty and conclusory fashion that certain disputed facts are not in dispute. As Plaintiff has painstakingly articulated in the context of Plaintiff's Response to Defendants' Rule 56.1 Statement of Fact, much of what was argued is in dispute. In the interests of efficiency, Plaintiff will attempt to debunk Defendants' factual claims in short succession.

Defendants argue that Nurse Ononiwu did not provide the saline solution. A reasonable jury could conclude that she did. (See **Plaintiff's Responses to Defendants' SOF**, 17, 27, 28, 29, 30; see also **Plaintiff's SOAF**, 8, 9, 10, 11, 14, 15, 16, 22, 23, 24, 25).

Defendants argue that it is undisputed that there was a reasonable basis to open an IV line with infusion for Mr. Green and that this did not amount to negligence. Defendants' experts arrive

10

at this point after creating their own story that the IV was started to "KVO" (keep vein open) to administer medicines. (See **Plaintiff's Responses to Defendants' SOF**, 49, 50, 52, 53, 55, 56).

Mention of the IV as a point to "KVO" or to administer medication exists nowhere in Nurse Ononiwu's testimony. This was a creation of the experts to try to explain away Nurse Ononiwu's consistent "infusing" and "still infusing" notations in the chart over a period of 43 minutes. Further, Defendants experts are ignoring the large volume of fluid removed from Mr. Green in subsequent dialysis. Defendants' experts also ignore Ms. Ononiwu's comments that she believed that infusing saline would decrease instead of increase Mr. Green's blood pressure. This is a circumstantial fact that could assist a jury to conclude that more fluid was transfused into Mr. Green in 43 minutes than an ounce. (See **Plaintiff's SOAF**, 4, 5, 6, 7, 8, 9, 10, 11, 13, 15, 16).

Defendants argue that there was no evidence that Nurse Ononiwu had any knowledge that Mr. Green was suffering from pulmonary edema. Nurse Ononiwu claimed to lack knowledge of what "pulmonary edema" even was and was only able to articulate that Mr. Green had "shortness of breath." (See **Plaintiff's SOAF**, 12(B); see also Nurse Ononiwu Deposition, Defendants' **Exhibit A**, pages 186:1 -7; 189:3 to 192:9).

Defendants argue that there is no evidence that Nurse Ononiwu was aware of Mr. Green's medical history. Nurse Ononiwu testified that she was aware he had ESRD and hypertension. (See **Plaintiff's SOAF**, 10; Defendant's **Exhibit A**, 178:1-12).

Defendants argue that Dr. Rauf's opinions as to Nurse Ononiwu's violation of the standard of care are immaterial. They argue their interpretation of the facts and their expert's opinions at length and with vigor. They argue as if disputed facts are undisputed.

The record is replete with evidence that Dr. Rauf (and to a lesser extent Dr. McFadden) testified that the appropriate care for Mr. Green was to get dialysis going as soon as possible. (See **Plaintiff's SOAF**, 17, 18, 20, 21). Dr. McFadden testified that if he had been called, he would have

11

asked the nurses to attempt prison dialysis. (See **Plaintiff's SOAF**, 19). Otherwise, Dr. Rauf testified that Nurse Ononiwu's "infusing" and "still infusing" of saline into Mr. Green violated the standard of care and lead to his demise. (See **Plaintiff's SOAF**, 17, 18, 20, 21).

**D. Sufficient Material Fact Exists to Permit Plaintiff to prevail upon her Illinois Wrongful Death Act Count against Dr. Obaisi's Estate and against Wexford itself.**

To prevail in a medical malpractice action in Illinois, the plaintiff has the burden of proving (a) the proper standard of care for the defendant medical care provider, (b) failure to comply with the standard of care, and (c) a resulting injury proximately caused by the medical defendant's deviation from the standard of care. *Purtill v. Hess,* 111 Ill.2d 229, (1986).

As Medical Director of Stateville Correctional Center, Dr. Obaisi was tasked with clinical care and administrative responsibilities that included running health clinics, and involvement in Continuous Quality Improvement directive run by the IDOC. (See **Plaintiff's SOAF**, 31, 32). The IDOC records produced by subpoena show that Mr. Green's medical file was never collected or incorporated into any CQI meeting in spite of the fact that other inmates with medical deaths and hospitalizations had their medical files collected and discussed. (See **Plaintiff's SOAF**, 40). Dr. Obaisi's duties to comply with IDOC CQI directives is no small matter and those duties include reporting all mortality, hospitalization, and deaths in the context of reports and meetings. (See **Plaintiff's SOAF**, 39, see also **Plaintiff's Exhibit 15**).

Defendants are correct that there is no evidence that Dr. Obaisi did *anything* related to Gerald Andre Green and plenty of evidence that he should have. It is undisputed that Dr. Obaisi did not even answer the phone when it was needed and in spite of being required to be on call for consultations. (See **Plaintiff's SOAF**, 34). Dr. Obaisi had duties that included the management of the entire medical unit and there is no evidence that he established any training whatsoever for nursing staff. (See **Plaintiff's SOAF**, 31, 33, 34, 35).

Dr. Rauf testified clearly that it was his opinion that Dr. Obaisi was not performing to the standard of a medical director. (See **Plaintiff's Exhibit 13**, see also **Defendants' Exhibit F**, 68:11 to 69:1). Dr. Obaisi was the medical director for one of the largest and most notorious Illinois prisons. He shares no small amount of the blame in the alleged failure of Wexford to follow the CQI Directives to the extent that they should have included discussions of Mr. Green in any context. (See **Plaintiff's SOAF**, 39, 40; see also **Defendants' Exhibit F**, 91:6 to 92:20; 92:24 to 94:9, 197:10 to 198:9).

Nurse Ononiwu struggled to articulate the corporate line "Wexford Policy Cannot Override Clinical Judgment" during her deposition when she was asked about the policy on emergency transfer to the hospital. (See **Defendants' Exhibit A**, pages 110:22 to 111:8). Realizing that she was struggling, Nurse Ononiwu fell back and testified that she could not remember the policy. (See **Defendants' Exhibit A**, 111:15 to 112:19). However, forty pages later, Nurse Ononiwu testified that it was her understanding that she had to follow Wexford protocol before calling an ambulance and that required getting permission from a Wexford physician first. (See **Plaintiff's SOAF**, 36). At the very least, Wexford's policy should be clear and fluid so that prisoners like Gerald Green have safe and speedy access to emergency rooms.

Even Mr. Green's medication for his hypertension was not clear and ironed out due to Wexford's policies. If Mr. Green's hypertension was better managed, the odds that he would not have had hypertensive emergencies would have been much lower. Dr. Davis, a Wexford physician who ran the hypertension clinic and reviewed Mr. Green in connection with his pending March 21, 2014 release for prison wrote a prescription for him to treat his hypertension with four medications on March 14, 2014. (See **Plaintiff's SOAF**, 26, 27, 28, 29, 30). Unfortunately, no one from Wexford thought to put Dr. Davis's Order into the Medication Administration Records of Mr. Green. As a result, he continued to only receive his clonodine until his March 19, 2014

13

hypertensive emergency. (See **Plaintiff's SOAF**, 26, 27, 28, 29, 30). This is further ample evidence of negligence against Wexford itself and it is Wexford's own records and former physicians that lay the groundwork for the foundation for the claim. Something is deeply and fundamentally wrong with Wexford when Mr. Green gets the closest look at his medications in the context of his *anticipated release from prison*. One would think that this level of detail might be done during the hypertension health clinic that was supposed to be prescribing his medications, but that would mean providing four medications instead of one for Mr. Green while he was under Wexford's care.

Nurse Ononiwu (who is an LPN and not an RN) should not have been left alone as the only urgent care nurse to grapple with very real life and death emergencies at 2:00 A.M. while undertrained and undereducated with her only resource being a telephone number for a medical director who may or may not take the call. Nurse Ononiwu's only medical training from Wexford was a yearly CPR class and the "floor training" she received when she started work. (See **Plaintiff's SOAF**, 34). Nurse Ononiwu never received training from a medical doctor while working for Wexford or any training related to how to deal with Stateville's dialysis patients. (See **Plaintiff's SOAF**, 35).

### IV. CONCLUSION

Plaintiff is aware that the record on this matter is voluminous and dense and requests the Court's patience as the Court sifts through the volumes of fact provided. Mr. Green was scheduled for release form prison for a non-violent drug offense on March 21, 2014. Unfortunately, his health condition put him in peril with the wrong people making critical life and death decisions at 2:00 A.M. on March 14, 2014. The record is replete with disputed factual issues connected to Nurse Ononiwu's conduct on that night and her testimony cannot be relied upon as undisputedly true. Otherwise, Dr. Obaisi and Wexford's failures and cloudy "hands off management approach" created the storm that Mr. Green experienced that ultimately prevented him from enjoying his

release from prison and his return to civilian life. For the foregoing reasons, due to the fact that the record is replete with disputed factual material that must be reviewed in a light most favorable to the Plaintiff, denial of Defendants' motion for summary judgment on all issues is appropriate.

        Respectfully submitted,

        /s/ Matthias D. Gill

        /s/ Wilton Person

Attorney No. 6282953 - Illinois
Matthias D. Gill
The Gill Law Firm, PC
217 West 55th Street, Ste 2
Clarendon Hills, IL 60514
(630) 849-3484
mgill@gillfirm.com

Attorney No. 6290441 - Illinois
Wilton A. Person
24330 Leski Lane
Plainfield, Illinois 60585
(815) 254-2467
wperson@personlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2021, I electronically filed the foregoing Plaintiff's Memorandum in Opposition to Defendants' Motion for Summary Judgment with the clerk of the court for the Northern District of Illinois, using the electronic case filing system of the court. The electronic case filing system sent a "Notice of E-Filing" to the attorneys of record in this case.

/s/ Matthias D. Gill

Attorney No. 6282953
Matthias D. Gill
The Gill Law Firm, PC
217 West 55th Street, Ste 2
Clarendon Hills, IL 60514
(630) 849-3484
mgill@gillfirm.com