**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KNIEAKAY T. HARRIS, | ) | |
| as independent administrator of the estate of | ) | |
| GERALD ANDRE GREEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 15-cv-10936 |
| v. | ) | |
| | ) | Judge Andrea R. Wood |
| WEXFORD HEALTH SOURCES, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

In March 2014, several days before his scheduled release from custody at Stateville

Correctional Center ("Stateville"), Gerald Andre Green suffered a medical emergency related to

his end-stage renal disease. Eventually, Green was transported by ambulance to an outside

hospital, where he later died. The administrator of Green's estate, Knieakay Harris, subsequently

brought suit asserting claims under 42 U.S.C. § 1983 and Illinois state law against Wexford

Health Sources, Inc. ("Wexford"), Dr. Saleh Obaisi (now deceased and represented here by

Ghaliah Obaisi, the independent executor of his estate), and Nurse Bernadette Ononiwu. Wexford

provides health care services to inmates in the custody of the Illinois Department of Corrections

and employed Dr. Obaisi and Nurse Ononiwu. Dr. Obaisi served as medical director of Stateville

and was on call the night Green presented with signs of distress, while Nurse Ononiwu provided

care to Green before his transfer to the hospital. Now before this Court is Defendants' motion for

summary judgment on all claims. (Dkt. No. 244.) For the reasons stated below, the motion is

granted in part and denied in part.

## BACKGROUND

Unless otherwise noted, the following facts are undisputed.

Green was a prisoner in the custody of the Illinois Department of Corrections ("IDOC") housed at Stateville. (Pl.'s Resp. to Def.'s Statement of Material Facts ("PRDMF") ¶ 7, Dkt. No. 248.) Green suffered from severe hypertension (*i.e.*, high blood pressure) for years, eventually leading him to suffer from end-stage renal disease. (*Id.* ¶ 38.) Over the last seven years of his life, Green required hemodialysis ("dialysis") to treat his end-stage renal disease. (*Id.*) On February 25, 2014, one month before his death at age forty-two, Green was admitted to the intensive care unit at St. Joseph Medical Center. (*Id.* ¶ 42; Def.'s Statement of Material Facts ("DSMF"), Tubbs Rep., Ex. C at 2, Dkt. No. 245-3.) Green was hypertensive and suffering from fluid overload (*i.e.*, too much fluid in the body) and pulmonary edema (*i.e.*, excess fluid in the lungs). (PRDMF ¶ 42.) After stabilizing his blood pressure and dialyzing him, the hospital released Green and he was returned to the prison. (*Id.* ¶¶ 42–43.)

Green continued to receive dialysis at Stateville. (*Id.* ¶¶ 40, 44.) NaphCare Inc., not Wexford, provided the dialysis treatment.[1] (*Id.* ¶ 16, n.1.) Green was also prescribed multiple medications to treat his hypertension. (Def.'s Resp. to Pl.'s Statement of Material Facts ("DRPMF") ¶ 27, Dkt. No. 250.) Medical records, however, indicate that Green may only have received one of those medications in March 2014. (*Id.* ¶ 30.) Additionally, it is not known whether Green received his regularly scheduled dialysis treatment on March 17, 2021.[2]

---

[1] Harris initially brought a claim against NaphCare for negligent spoliation of evidence based on the loss of Green's dialysis records from the time immediately preceding his death. (*See* Fourth Am. Compl. ("FAC"), Dkt. No. 113.) That claim has settled. (*See* Stipulation of Dismissal, Dkt. No. 222.)

[2] Harris maintains based on billing records that Green underwent dialysis (DRPMF ¶ 1), while Defendants point to medical records stating that Green declined dialysis. (PRDMF ¶ 44.) The Court finds this dispute immaterial to the present motion for summary judgment, as the claims asserted against Defendants relate only to the events of the early morning hours of March 19, 2014.

Regardless, all agree that in the early morning hours of March 19, 2014, Green was being prepared for dialysis when he presented with shortness of breath. (PRDMF ¶ 45.) As a result, rather than starting dialysis, dialysis tech Lucinia Martin transported Green by wheelchair to the urgent care facility around 2:00 a.m. (*Id.*; DRPMF ¶ 6.) Nurse Ononiwu was staffed at the urgent care area of the infirmary that night. (PRDMF ¶ 19; DRPMF ¶ 8.) Upon Green's arrival, Nurse Ononiwu was informed by Martin that Green had complained of shortness of breath and chest pain. (PRDMF ¶ 19; Pl.'s Statement of Material Facts ("PSMF"), Martin Dep., Ex. 11 at 35:9–11, Dkt. No. 249-11.)

What happened next is subject to disagreement, although some elements of the narrative remain uncontested. The parties do not dispute that Nurse Ononiwu did not have any involvement in Green's medical care prior to the occurrence at issue and that her first (and only) interaction with Green began at 2:00 a.m. on March 19, 2014. (PRDMF ¶ 15.) Nor do the parties dispute that Nurse Ononiwu was responsible for drafting the progress notes for Green on the night in question. (*Id.* ¶ 18.) The parties also agree on the timeline of events, Green's condition during this time, and (most of) the treatment rendered to him as detailed in the medical notes compiled by Nurse Ononiwu.

As noted, Green was transferred from the dialysis room, then-staffed by a dialysis nurse and tech, to the urgent care area around 2:00 a.m. by dialysis staff, after he showed shortness of breath. (*Id.* ¶ 16.) Upon his arrival, Nurse Ononiwu took Green's vital signs and performed a physical assessment, noting that he presented as having difficulty breathing and that he had been brought to urgent care by a dialysis provider after complaining of shortness of breath and chest pain upon entering the dialysis unit. (*Id.* ¶ 19.) At 2:00 a.m., Green's blood pressure was 260/140, his heart rate was 65, his respiration rate was 23, and his oxygen saturation was 72. (*Id.* ¶ 18.) The

notes state that, at 2:05 a.m., Nurse Ononiwu attempted to call Dr. Obaisi, the medical director for Stateville, but was unable to reach him. (*Id.* ¶¶ 3, 21.) Following IDOC procedure, Nurse Ononiwu then called Dr. Ahmed (medical director of the Northern Regional Center, the receiving institution for Stateville).[3] (*Id.* ¶ 21.) After Nurse Ononiwu relayed Green's vitals and physical assessment, Dr. Ahmed directed her to transfer Green to the hospital. (*Id.*) Nurse Ononiwu testified that she immediately called an ambulance (DSMF, Ononiwu Dep., Ex. A, 167:18–20, Dkt. No. 245-1), and Harris does not dispute that she did so.

At 2:07 a.m., the notes state that Green was given 0.4 milligrams of nitro and an IV 0.9 percent sodium chloride (saline) was started while Green was still on oxygen. (PRDMF ¶ 22.) Eight minutes later, at 2:15 a.m., Nurse Ononiwu wrote another note listing Green's vital signs and noting that the nitro, oxygen, and IV were still on. (*Id.* ¶ 23.) As to the IV, the note stated "IV 0.9 percent still infusing while waiting for the ambulance to arrive." (*Id.*) At 2:30 a.m., another note indicated that the IV was "still infusing" and updated Green's stats. (*Id.* ¶ 24.) Nurse Ononiwu did not record the rate of infusion for the IV, nor could she later recall the rate. (DRPMF ¶ 11.) Finally, the ambulance arrived and Green was transferred out of Stateville at 2:50 a.m. (PRDMF ¶ 26.) Green was subsequently dialyzed at the outside hospital, with more than six liters of fluid removed from his body over the course of three sessions. (DRPMF ¶ 4.)

Although this general timeline is undisputed, Nurse Ononiwu's involvement with and the details around the saline IV remain contested. Harris asserts that Nurse Ononiwu, and Nurse Ononiwu only, was present in the infirmary that night. (*Id.* ¶ 8.). To support this position, Harris notes that when Martin brought Green to the urgent care section of the medical wing, Nurse Ononiwu was alone. (*Id.*) According to Harris, Nurse Ononiwu was, if not personally responsible

---

[3] The record does not reflect a first name for Dr. Ahmed.

for all aspects of Green's care on the night of March 19, 2014, at least aware of the insertion of the IV and infusion of the saline solution. (*Id.* ¶¶ 10, 14.) In contrast, Defendants maintain that, other than taking initial vital signs and conducting an assessment, Nurse Ononiwu did not provide hands-on care of or treatment for Green. (PRDMF ¶ 29.) In particular, Defendants state that Nurse Ononiwu neither administered the IV nor gave an order for anyone else to do so. (*Id.* ¶ 28.) Instead, according to Defendants, Nurse Ononiwu was only responsible for calling doctors and preparing to transfer Green, while other nurses actually treated Green, including by inserting the IV. (*Id.* ¶¶ 27–28.)

Both sides have also provided conflicting expert reports as to both the likely meaning of the medical notes indicating that Green was receiving an "infusion" of saline solution through an IV and the appropriateness of that form of treatment. Defendants offer expert reports by Dr. Kennon Tubbs, a physician who practices in a correctional facility, and Dr. David Leehey, a professor of medicine and nephrology at Loyola University of Chicago Medical Center. Both doctors opine that the IV was likely placed to provide access in the event emergency medication was needed. (Tubbs Rep. at 4. DSMF, Leehey Rep., Ex. E at 2, Dkt. No. 245-5.) Because the doctors believe the IV was inserted only as a placeholder, both opine that only a small volume of fluid would have been infused into Green, and therefore it likely did not contribute to his death. (PRDMF ¶ 50; Tubbs Rep. at 4; Leehey Rep. at 2.) In fact, Dr. Tubbs states that the nurses[4] who treated Green were following the American Heart Association Advanced Cardiac Life Support (ACLS) protocol in inserting the IV, and that the failure do so would be a gross deviation from the standard of care. (PRDMF ¶ 49–50; Tubbs Rep. at 5.) Dr. Tubbs further suggests that leaving

---

[4] Both Dr. Tubbs and Dr. Leehey adopt Nurse Ononiwu's testimony that a team of nurses was responsible for any actions related to the IV.

Green at the prison to undergo dialysis (as suggested by Harris's expert), rather than initiating Green's transfer to the hospital to a higher level of care, would also constitute a deviation from the standard of care. (PRDMF ¶ 51; Tubbs Rep. at 4.))

Harris's expert, Dr. Anis Rauf, a nephrologist, reaches a competing conclusion as to the quality of care provided to Green. According to Dr. Rauf, a competent nurse should have realized that Green, a known dialysis patient, was suffering from fluid overload and required emergency dialysis. (PRDMF ¶ 61; DRPMF ¶ 18.) Dr. Rauf primarily criticizes Nurse Ononiwu for starting a saline infusion, which he states more than likely exacerbated Green's respiratory failure. (PRDMF ¶ 60.) In his opinion, any competent medical provider should have known the saline was improper and, at the very least, should have discontinued the infusion as Green's condition worsened. (DRPMF ¶ 20.) Additionally, based on his experience as a medical director of a dialysis center, Dr. Rauf opines that Dr. Obaisi should have ensured there was a set protocol that a patient with Green's presentation would not be given saline and instead would be directed to emergency dialysis. (PRDMF ¶ 66; DSMF, Rauf Dep., Ex. F at 93:3–94:17, Dkt. No. 245-6.)

## DISCUSSION

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate if the admissible evidence considered as a whole shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law, even after all reasonable inferences are drawn in the non-movant's favor. *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 517 (7th Cir. 2011). Courts may consider the "'materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or

other materials'" in deciding a motion for summary judgment. *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017) (quoting Fed. R. Civ. P. 56(a)).

## I.      Deliberate Indifference Claim Against Nurse Ononiwu (Count I)

Defendants first seek summary judgment on the deliberate indifference claim against Nurse Ononiwu. "[D]eliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97 (1976) (quoting *Gregg v. Georgia*, 328 U.S. 153, 173 (1976)) "To prevail on a deliberate-indifference claim, the plaintiff must prove that he suffered from (1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (internal quotation marks omitted). The parties here do not dispute that Green, who suffered from end-stage renal disease and severe hypertension, had a serious medical condition. Rather, the parties disagree as to whether Harris has "provide[d] evidence that [the defendant] ***actually*** knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)) (emphasis in original).

The plaintiff bears the burden of demonstrating deliberate indifference, and the bar the plaintiff must clear to do so is high. *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). "[E]valuating the subjective state-of-mind element can be difficult," particularly when a medical professional is accused of providing inadequate, rather than no, treatment. *Whiting*, 839 F.3d at 662. While an inmate "need not establish that prison officials actually intended harm to befall him from the failure to provide adequate care," negligence or inadvertence is not enough, as "deliberate indifference is not medical malpractice; the Eighth Amendment does not codify common law torts." *Elyea*, 631 F.3d at 857 (internal quotation marks omitted); *see also King v. Kramer*, 680

F.3d 1013, 1019 (7th Cir. 2012) ("Nevertheless, '[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner.'") (quoting *Estelle*, 429 U.S. at 106). Thus, it is well-established that for claims of deliberate indifference a "medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008) (internal quotation marks omitted). And "a prison medical professional faces liability only if his course of treatment is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Campbell v. Kallas*, 936 F.3d 536, 545 (7th Cir. 2019) (internal quotation marks omitted).

Even assuming that Nurse Ononiwu placed the IV for the saline solution and that the infusion directly injured Green by exacerbating his condition,[5] the deliberate indifference claim against her fails as Harris cannot demonstrate that Nurse Ononiwu was aware of, and subsequently disregarded, the risks associated with patients who are volume overloaded. Here, Harris's claim can be summarized as follows: Nurse Ononiwu knew that Green was suffering from volume overload and, despite this, proceeded to start a saline infusion, which any competent medical professional would know would worsen his condition. There is no evidence that Nurse Ononiwu intended to cause Green pain, nor is there any direct evidence that Nurse Ononiwu was informed that Green was suffering from fluid overload and insertion of a saline drip would harm him. Accordingly, to succeed on her claim, Harris must show that Ononiwu's actions were such a departure from accepted professional standards so as to infer subjective awareness of the risk—in

---

[5] As noted, Defendants dispute that Nurse Ononiwu placed the IV and maintain that any infusion of saline solution would have been minimal.

other words, that no medical professional operating within the bounds of accepted medical practice would fail to diagnose Green as volume overloaded and then begin an IV infusion. *See Estate of Cole v. Fromm*, 94 F.3d 254, 261–62 (7th Cir. 1996).

Yet here, Harris cannot demonstrate that, based on the medical information available to Nurse Ononiwu the night of March 19, 2014, a reasonable jury could infer that Nurse Ononiwu must have known that Green was suffering from volume overload. To support her position, Harris primarily relies upon an expert opinion by Dr. Rauf. According to Dr. Rauf, a competent medical professional who treats dialysis patients would have recognized that Green was volume overloaded and needed emergency dialysis.[6] (DRPMF ¶ 18) Nurse Ononiwu, however, is ***not*** a dialysis nurse, nor is there any suggestion that she has experience treating dialysis patients. And Harris provides no basis from which to find that medical professionals without experience in dialysis would know that a patient with Green's symptoms was volume overloaded and needed emergency dialysis. In fact, the record is clear that other medical professionals with whom Nurse Ononiwu interacted that night, including those specializing in renal care, did not recognize that Green required immediate dialysis to treat volume overload. Indeed, Green was only brought to Nurse Ononiwu ***after*** both the dialysis nurse and tech on duty interacted with him and determined that he should be transferred out of the dialysis room to urgent care. *Cf. Zaya v. Sood*, 836 F.3d 800, 806 (7th Cir. 2016) (noting that a "jury could infer conscious disregard of a risk from a defendant's decision to ignore instructions from a specialist"). Additionally, Nurse Ononiwu discussed Green's condition with Dr. Ahmed, who recommended that Green be transferred to a

---

[6] For instance, Dr. Rauf testified that "any competent nurse that [he has] been working with that has experience taking care of renal patients should be able to figure [] out" that a dialysis patient with high blood pressure and shortness of breath should be dialyzed immediately (Rauf Dep. at 63:12–21) and that, based on Green's medical presentation, "any standard nephrologist can tell you that means the patient is volume overloaded." (Rauf Dep. at 129: 17–23.)

hospital, not sent back to the dialysis room as would be expected for a volume overloaded patient. Yet to sustain a claim for deliberate indifference against a medical professional, the "treatment received [must be] so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate his condition." *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011) (internal quotation marks omitted).

Moreover, Dr. Rauf's own report and testimony confirms that, although he believes Nurse Ononiwu should have recognized Green as being volume overloaded, such a diagnosis was not the only explanation for Green's symptoms. For instance, Dr. Rauf writes that Green "did display symptoms and numerous complaints of SOB [shortness of breath] which ***can*** be due to fluid overload in the dialysis patient especially if [patient] had inadequate or insufficient or even missed hemodialysis or ultrafiltration. (PSMF, Rauf Rep., Ex 13 at 2, Dkt. No. 249-13.). But that Green's symptoms could have been, or even were likely to have been, caused by volume overload does not mean that failure to diagnose his condition as such satisfies the subjective component of a deliberate indifference claim. *Arnett*, 658 F.3d at 751 (emphasizing that because "deliberate indifference is more than negligence and approaches intentional wrongdoing . . . [a] plaintiff can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment" (internal quotation marks omitted)). Dr. Rauf's testimony acknowledges that there are instances where a dialysis patient presenting with a hypertensive crisis like Green would ***not*** be suffering from volume overload. (*See* Rauf Dep. at 135:11–13 (stating that "nine times out of ten" a patient with Green's medical presentation be suffering from fluid overload).) Put simply, there is nothing in the record by which a reasonably jury could find that Nurse Ononiwu knew Green was suffering from volume overload.

Yet if Nurse Ononiwu was unaware of Green's condition, then she could not have consciously disregarded the risk that infusing a saline solution posed to his well-being. Indeed, Harris does not argue that, even if Green were *not* volume overloaded, the infusion of a saline drip would have been outside of accepted medical practice. Accordingly, Harris cannot satisfy the required subjective element of a deliberate indifference claim. *See Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002) (recognizing that a "negligent or inadvertent failure to provide adequate medical care is insufficient to state a section 1983 claim" because such a failure does not suffice to show the required subjective element of an unnecessary and wanton infliction of pain).

Finally, the Court notes that the Complaint also alleges deliberate indifference based on undue delay in treatment, claiming that Nurse Ononiwu failed to address Green's emergency condition promptly. A delay in treatment can demonstrate deliberate indifference. *See Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) ("A significant delay in effective medical treatment also may support a claim of deliberate indifference, especially where the result is prolonged and unnecessary pain.") However, a plaintiff must still provide evidence that the defendant acted with the "requisite bad intent" in delaying treatment to support their claim. *See Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015) (finding a two-day delay in dispensing pain medication may constitute negligence but, without more, is not enough to show a culpable mental state for purposes of sustaining a claim for deliberate indifference).

At this stage in the proceedings, it is undisputed that Nurse Ononiwu first became involved in Green's care around 2:00 a.m., and that by 2:05 a.m., she had assessed his vitals, called Dr. Obaisi and then Dr. Ahmed for instruction, and had been directed to and did call an ambulance for Green. While there was a delay of almost an hour between Nurse Ononiwu's phone call and the ambulance's arrival to transport Green to the hospital at 2:50 a.m., Harris puts forward no

evidence to suggest that this delay is attributable to any action (or inaction) by Nurse Ononiwu. In short, based on the current record, there is no evidence of an undue delay in treatment by Nurse Ononiwu, let alone evidence that any such delay was caused by her bad intent.

When determining whether summary judgment is appropriate on a claim for deliberate indifference in the medical context, the Court "must remain sensitive to the line between malpractice and treatment that is so far out of bounds that it was blatantly inappropriate or not even based on medical judgment." *King*, 680 F.3d at 1019. Here, because no reasonable jury could find that Nurse Ononiwu's alleged actions so departed from accepted professional judgment, practice, or standards so as to demonstrate the subjective state-of-mind element required for a deliberate indifference claim, summary judgment in favor of Defendants is warranted.

## II. Illinois Wrongful Death Claim Against Nurse Ononiwu (Count II)

Defendants also seek summary judgment on Harris's claim under the Illinois Wrongful Death Act, 740 ILCS 180/1 *et seq.*, against Nurse Ononiwu. To maintain such a cause of action, the plaintiff must allege that the defendant owed a duty to the decedent, that the defendant breached that duty, that the breach of duty proximately caused the decedent's death, and that pecuniary damages occurred to persons designated by statute. *Rodgers v. Cook Cty.*, 998 N.E.2d 164, 172 (Ill. App. Ct. 2013). When the claim involves allegations of medical malpractice, as it does here, the plaintiff must establish "(1) the proper standard of care against which a physician's conduct is measured, (2) a negligent failure to comply with the applicable standard of care, and (3) a resulting injury proximately caused by the physician's lack of skill or care." *Ford-Sholebo v. United States*, 980 F. Supp. 2d 917, 980 (N.D. Ill. 2013) (citing *Sullivan v. Edward Hosp.*, 806 N.E.2d 645, 653 (Ill. 2004)). The bar to support a claim of medical malpractice is lower than that required for deliberate indifference. *See Petties*, 836 F.3d at 729 ("[B]latant disregard for medical

standards could support a finding of mere medical malpractice, or it could rise to the level of deliberate indifference, depending on the circumstances."). And typically, the "standard of care must be established through expert medical testimony." *Chiero v. Chi. Osteopathic Hosp.*, 392 N.E.2d 203, 208 (Ill. App. Ct. 1979).

The primary basis for the wrongful death claim against Nurse Ononiwu is the same as that for the deliberate indifference claim—namely, that she improperly started a saline infusion that more than likely exacerbated Green's condition and resulted in his death.[7] Defendants contend that this claim must fail as Nurse Ononiwu testified that a team of nurses, rather than her, was responsible for placing and monitoring the IV. According to Defendants, Harris provides no evidence with which to dispute this testimony but instead relies solely on challenges to Nurse Ononiwu's credibility.

It is true that, although "evaluations of witness credibility are inappropriate at the summary judgment stage," a plaintiff may not solely rely on a challenge to witness credibility, without providing any independent facts, to support her claim. *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008). But Harris does not simply challenge Nurse Ononiwu's motives in questioning the veracity of her testimony. As Harris notes, Nurse Ononiwu's testimony is contradicted, at least in part, by other portions of the record. For instance, while Nurse Ononiwu testified that she was accompanied by a male technician that night, dialysis tech Martin stated that Nurse Ononiwu was alone when Green was dropped off at urgent care. Additionally, Nurse Ononiwu was the only individual to record any medical notes from the incident, and those notes do not reference the

---

[7] The Complaint also alleges that Nurse Ononiwu negligently failed to transfer Green immediately to a hospital. As discussed above, the record shows that Nurse Ononiwu called an ambulance within five minutes of taking over Green's care, and Harris no longer appears to advance the argument that any delay in treatment suffered by Green is attributable to Nurse Ononiwu.

presence of any other care provider (although they do mention Nurse Ononiwu's attempted call to Dr. Obaisi and discussion with Dr. Ahmed). Although Nurse Ononiwu provides an explanation for the lack of documentation regarding others' involvement, the medical notes provide an independent basis for questioning her version of events. At the very least, Harris has provided "some shred of affirmative evidence to call into question" Nurse Ononiwu's credibility such that summary judgment is not appropriate. *Cichon v. Exelon Generation Co., LLC*, 401 F.3d 803, 815 (7th Cir. 2005) (finding that summary judgment in the defendant's favor was required when the plaintiff's only evidence was that the defendant's witness was not worthy of belief).

Defendants nonetheless maintain that they are entitled to summary judgment even assuming that Nurse Ononiwu started the saline infusion, because no reasonable jury could conclude that action was either negligent or injured Green. In support of this position, Defendants point to the opinions of both Dr. Tubbs and Dr. Leehey finding that the insertion of the IV was both within the standard of care and unlikely to have harmed Green. Yet in reaching those conclusions, both experts routinely construe the facts in the light most favorable to Nurse Ononiwu. For instance, both Dr. Tubbs and Dr. Leehey write that the most likely interpretation of the medical notes is that the IV was inserted simply to preserve IV access. Under that version of events, any drip rate of a saline solution would likely be so minimal as to have little to no impact on Green's condition. Those conclusions, however, are not based on undisputed facts but rather each expert's interpretation as to the purpose of the insertion of the IV line. Similarly, both experts assume a minimal IV drip rate for the saline solution. Yet the actual drip rate was never recorded, and so the experts' assumptions are based largely on speculation. And the determination of the

drip rate is critical. In his deposition, Dr. David McFadden, a nephrologist,[8] expressly noted that the effect of running a saline infusion on a patient like Green "depends on the rate." (DRPMF, McFadden Dep., Ex. 9 at 58:21–59:8, Dkt. No. 249-9.) At the summary judgment stage, the Court must draw all inferences from the evidence in favor of Harris, not Nurse Ononiwu. Defendants' experts were not so constrained and thus their reports do not resolve the factual dispute over whether regarding the reason the IV drip was inserted. *See Williams v. Mary Diane Schwarz, P.A.*, No. 15 C 1691, 2018 WL 1961143, at \*6 (N.D. Ill. Apr. 26, 2018) (noting that reports submitted by a defendant's retained experts could not support summary judgment in part because the experts adopted the defendant's version of events when it conflicted with that of the plaintiff).

Further undermining Defendants' position is Harris's submission of a competing expert report by Dr. Rauf. In Dr. Rauf's opinion, the medical notes indicate not that an IV was placed only to ensure later access, but that a saline infusion of a medically significant amount was given to Green. According to Dr. Rauf, Nurse Ononiwu should have recognized that Green, a dialysis patient suffering from end-stage renal failure, was experiencing volume overload rather than a cardiac emergency. Where a patient is volume overloaded, any infusion such as the one allegedly given by Nurse Ononiwu would be, in Dr. Rauf's opinion, a deviation from the standard of care that would exacerbate the patient's already critical condition. Moreover, Dr. Rauf criticizes Nurse Ononiwu not only for the saline infusion, but also for the failure to order emergency dialysis. In his view, as well as Dr. McFadden's, the proper course of treatment would have been emergency dialysis (if possible).

---

[8] In 2014, Dr. McFadden was contracted by NaphCare to serve as a consulting nephrologist to several prisons, including Stateville. (DRPMF ¶ 4; McFadden Dep. at 12:24–14:11.)

Defendants do not argue that such treatment was not available, but instead again refer to their own experts' opinions that Green received appropriate treatment. However, it is not for the Court to determine, at this stage, which expert's findings are entitled to more weight. *See Giles v. Ludwig*, No. 12-v-6746, 2014 WL 4358475, at *3 (N.D. Ill. Sept. 3, 2014) ("Resolution of competing experts' opinions requires credibility determinations that are inappropriate for the Court to engage in at the summary judgment stage."). Because Harris has shown that there is a genuine dispute of material fact as to whether Nurse Ononiwu was responsible for the saline infusion and whether that infusion constituted medical malpractice that injured Green, the Court denies Defendants' motion for summary judgment as to Count II.

Defendants correctly note, however, that even if Harris's claim goes forward, Harris cannot recover punitive damages. The Healing Art Malpractice Act ("HAMA"), 735 ILCS 5/2-1115, states that "[p]unitive damages [are] not recoverable in healing art and legal malpractice cases." *See also Fitzgerald v. Roberts*, No. 17 CV 9284, 2019 WL 3231387 at *3 (N.D. Ill. July 18, 2019) (finding that plaintiffs were statutorily barred from pursuing punitive damages, even for intentional misconduct claims, against medical defendants, noting that "HAMA is broad" and "pertains to all medical malpractice actions"). Nurse Ononiwu's conduct as a registered nurse in providing (or failing to provide) medical care to Green undoubtedly falls within the meaning of "medical . . . or other healing art malpractice." 735 ILCS 5/2-1704. Indeed, Harris does not appear to dispute this point. Thus, while the Court denies summary judgment as to the claim against Nurse Ononiwu, Harris is limited to recovering compensatory damages only.

### III.    Illinois Wrongful Death Claim Against Dr. Obaisi (Count III)

Defendants also seek summary judgment on the medical malpractice claim against Dr. Obaisi, brought pursuant to the Illinois Wrongful Death Act and grounded in medical malpractice.

As has already been noted, to prevail, Harris must prove (1) the proper standard of care for the defendant medical care provider, (2) a negligent failure to comply with that standard, and (3) a resulting injury proximately caused by the defendant's lack of skill or care. *Jinkins v. Evangelical Hosps. Corp.*, 783 N.E.2d 123, 126–27 (Ill. App. Ct. 2002). Harris advances two theories under which Dr. Obaisi is allegedly liable; the Court addresses each in turn.

First, Harris contends that Dr. Obaisi breached the duty of care by failing to answer Nurse Ononiwu's phone call and provide the medical staff at Stateville with direction regarding Green's care on the night of March 19, 2014. But Harris is unable to demonstrate that Dr. Obaisi had any duty to answer the phone that night. To support her contention, Harris points to a Wexford policy stating that a Wexford physician is to be available for consultation twenty-four hours a day, seven days a week. But this policy does not specify that ***Dr. Obaisi*** must be on call, only that ***some*** Wexford physician must be available. As Dr. Neil Fisher, the corporate medical director for quality management and pharmacy for Wexford, testified, Wexford had designated on-call individuals. (PRDMF ¶ 36.) Harris provides no evidence that Dr. Obaisi was that individual. In any event, the procedure in place at IDOC was first to call Dr. Obaisi, and then, if he could not be reached, Dr. Ahmed, the Medical Director at the on-site receiving institution. When Nurse Ononiwu was unable to reach Dr. Obaisi immediately, she followed Wexford policy and called (and reached) Dr. Ahmed. Harris does not assert, and nothing in the record supports, that Dr. Ahmed was an unqualified substitute or otherwise unable to provide appropriate direction.[9] Accordingly, no reasonable jury could find that Green suffered harm because Dr. Obaisi did not pick up one phone call and liability cannot rest upon this theory.

---

[9] The Court also notes that Harris has not asserted any claims against Dr. Ahmed in relation to Green's care, including for instructing Nurse Ononiwu to transfer Green to a hospital rather than initiating emergency dialysis.

Harris's second theory of liability is founded not on Dr. Obaisi's role as a clinician the night of March 19, 2014, but his role as Medical Director for Stateville.[10] Specifically, Harris asserts that Dr. Obaisi had a duty to properly train medical staff, including Nurse Ononiwu, on how to respond to a patient like Green. But the record shows that Dr. Obaisi's main responsibility was providing clinical care, although his position also involved some administrative responsibilities such as participating in utilization management,[11] collegial discussions in his role as a clinician and medical director, and attending statewide quarterly meetings for IDOC alongside other individuals involved in correctional medical care. (*See* PRDMF, Fisher Dep., Ex. B at 39:11–41:4, Dkt. No. 245-2.)

Harris fails to offer any evidence to rebut Defendants' claim that Dr. Obaisi's role as medical director was chiefly clinical in nature and not related to overseeing or training. Harris attempts to rely on the deposition of Dr. Fisher to support her position, but his testimony supports Defendants, not Harris. When asked whether Dr. Obaisi's duties included the training of nursing staff, Dr. Fisher responded that Dr. Obaisi may have been asked to train some individuals and that he served as a resource for individual nurses with questions. According to Dr. Fisher, this was the extent to which Dr. Obaisi would be responsible for any training. But that Dr. Obaisi might have trained individual nurses (on request) does not mean that he was responsible for overseeing the training program for all nurses at Stateville.

---

[10] In her Fourth Amended Complaint, Harris also claims that Dr. Obaisi failed to provide regular and appropriate dialysis to Green. As has already been discussed, however, NaphCare, not Wexford or Dr. Obaisi, was in charge of dialysis treatments at Stateville.

[11] As described by Dr. Fisher, utilization management is the review of off-site care expenses (especially those related to hospital services). (Fisher Dep. at 11:21–25.)

Harris next points to Dr. Rauf's opinion that Dr. Obaisi, as the medical director, had a duty to train and supervise the nursing staff and should have developed protocols to ensure that any patient experiencing volume overload would be directed to emergency dialysis and would not receive an infusion of saline. But Dr. Rauf's opinion is admittedly based not on any knowledge of Dr. Obaisi's assigned job responsibilities but rather on his own experience as a medical director of a private dialysis center. Under Illinois law, when considering whether a defendant's actions in a medical malpractice case fell below the standard of care, the "relevant consideration is the 'degree of knowledge, skill, and care which a reasonably well-qualified physician *in the same or similar community* would bring to a *similar case under similar circumstances*.'" *Johnson v. United States*, 65 F.Supp.3d 595, 607–08 (N.D. Ill. 2014) (quoting *Purtill v. Hess*, 489 N.E.2d 867, 872 (Ill. 1986)) (emphasis added). Neither Harris nor Dr. Rauf provides a basis from which to assume that the duties of the medical director of a private dialysis clinic are analogous or similar to those of a medical director of a correctional facility. Simply put, there is no reason to believe that positions titled "medical director" are equivalent across clinical contexts. Harris cannot create a genuine dispute of material fact as to Dr. Obaisi's duties as Stateville's medical director merely because, in other non-correctional environments, a position titled "medical director" was responsible for training and supervising staff. This is especially the case when, as here, Defendants have provided evidence expressly delineating the scope of the disputed duties.

Finally, Harris asserts that Dr. Obaisi breached his duty to participate in quality improvement programs that required review of any critical care incidents by failing to include Green's medical file in any such discussions. Harris relies upon an IDOC directive stating that the Agency Medical Director is responsible for developing such programs and must participate in monthly reviews of the appropriateness of care provided to patients in specific situations,

including visits to the emergency room. (DRPMF ¶ 39.) Critically, however, Harris fails to explain how Dr. Obaisi's failure to include Green's medical file in any of these discussions resulted in actionable harm.

Because there is no dispute of material fact as to whether Dr. Obaisi breached a duty to Green or that Green suffered harm as a result, the Court grants summary judgment in favor of Dr. Obaisi's representative on Count III.

## IV.    Illinois Wrongful Death Claim Against Wexford (Count IV)

Finally, Harris asserts a claim against Wexford pursuant to the Illinois Wrongful Death Act by and through its employees (here, Nurse Ononiwu and Dr. Obaisi). For the reasons given above, the claim against Nurse Ononiwu survives summary judgment while the claim against Dr. Obaisi does not. Thus, summary judgment for Wexford is inappropriate at this time, although Wexford may only be liable on the basis of the alleged negligence of Nurse Ononiwu.

In her briefs, Harris also advances the argument that Wexford is independently liable for the failure to administer Green's hypertension medication properly leading up to his death. Specifically, Harris suggests that Wexford's policies were unclear and resulted in Green only receiving one (out of four) medications in the days before he experienced hypertensive crisis and volume overload. However, "a party may neither amend its pleadings by argument in opposition to summary judgment nor introduce new theories of liability in opposition to summary judgment." *Colbert v. City of Chicago*, 851 F.3d 649, 656 (7th Cir. 2017) (internal quotation marks omitted). While plaintiffs can alter or amend legal theories without formal amendment, the factual basis for those claims must be included in the complaint. *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 859 (7th Cir. 2017); *see also Whitaker v. Milwaukee Cty., WI*, 772 F.3d 802, 808 (7th Cir. 2014) (describing how advancing a different ground for discrimination or a new theory

of retaliation in a plaintiff's briefings on summary judgment constitutes an impermissible attempt to amend a complaint) (citations omitted). "[T]he district court has discretion to deny [a] *de facto* amendment and to refuse to consider the new factual claims." *Chessie*, 867 F.3d at 860 (citations omitted).

While the Court finds it troubling that Green might not have received all of the medications he required to manage his condition, the claim that Wexford is responsible for this failure is a new factual allegation. Beyond the claims stemming from Nurse Ononiwu's alleged delay in treatment and improper infusion of a saline solution, Harris's Fourth Amended Complaint alleges that Wexford "negligently and carelessly failed to order, review, and provide regular and appropriate dialysis" for Green. (FAC, ¶ 31.) Neither the operative complaint nor earlier ones contain any claims related to the medications received (or not received) by Green. But a claim that Wexford failed to provide appropriate care related to the provision of ***dialysis*** does not put Wexford on notice that it was facing a claim based on the prescription and administration of Green's ***medications***.

Instead, this claim has been raised for the first time in response to Wexford's summary judgment motion. And Wexford's alleged negligence regarding Green's medications appears to have been barely (if at all) addressed in discovery. For instance, although Green's medication administration records were provided to the parties' experts, none of the reports offered opinions as to the importance of those medications or Wexford's responsibility for their distribution.[12] Indeed, it is unclear as to whether Wexford's liability would lie in the failure to prescribe more

---

[12] Dr. Rauf mentions the medications, writing that "[i]t is important to note that Mr. Green was not given the prescription order for these five medications until Dr. Davis created his [sic] discharge paperwork on March 14, 2014. This suggests that Wexford physicians knew he needed multiple medications to manage his HTN [hypertension] but would only provide him with the clonidine in prison." (Rauf Rep. at 2.) But Dr. Rauf gives no opinion as to the standard of care regarding the administration of these medications or that any breach thereof caused Green's medical emergency.

medications before March 14, 2014 (when Dr. Ann Davis, a Wexford physician, apparently changed his prescription from one to four medications) or the failure to administer that prescription in the five days before his death. And Defendants did not include any facts related to Green's medication history, let alone Wexford's responsibility for managing those prescriptions, in their Local Rule 56.1 statement. Nor did Defendants address the issue in their briefing until Harris raised the potential claim in her own response. In short, this is not a case where the parties "clearly contemplated" claims predicated on Green's medication, thus legitimizing their inclusion now. *Hartzol v. McDonalds's Corp.*, 437 F.Supp.2d 805, 813 (N.D. Ill. 2006) (finding that the defendant had impliedly consented to additional claims after the parties conducted discovery on the additional issues and the defendant responded to them in both their Local Rule 56.1 statement and briefings). As such, the claim against Wexford survives summary judgment only as to Nurse Ononiwu's alleged negligence and not as to any negligence related to Green's medication.

## CONCLUSION

Accordingly, for the reasons stated above, Defendants' motion for summary judgment (Dkt. No. 244) is granted as to Counts I and III, granted as to Count II solely on the issue of punitive damages, and denied as to Count IV.

ENTERED:

Dated:  March 31, 2022

_____
Andrea R. Wood
United States District Judge